[Civ. No. 20068. Second Dist., Div. Three. Aug. 10, 1955.]

JACK H. SKIRBALL et al., Respondents, v. RKO RADIO PICTURES, INC. (a Corporation), Appellant.

Mitchell, Silberberg & Knupp, Guy Knupp and Peery Price for Appellant.

Belcher, Kearney & Fargo, Frank B. Belcher and George M. Henzie for Respondents.

WOOD (Parker), J.—Action for damages for breach of an alleged oral contract. Judgment was for plaintiff for $397,486.55. Defendant appeals from the judgment.

Appellant contends that: (1) The evidence was insufficient to support the finding that the parties entered into a contract. (2) Mr. Rogell, who allegedly represented defendant in the negotiations, had no authority to bind defendant by such alleged contract. (3) The alleged "cause of action is barred by the Statute of Frauds." (4) The court erred in rulings regarding admissibility of evidence. (5) The award of damages was improper.

Plaintiff Gold Seal Productions, Inc., was engaged in the business of making motion pictures and acquiring literary "properties" for use in making such pictures. Jack H. Skirball, a motion picture producer, was president of plaintiff corporation, and Bruce Manning, a writer, was vice-president. The stock of plaintiff was owned by Skirball, his brother and Manning. They also owned the stock of Crest Productions, Inc., Loring Theatres, Inc., and Gwenaud Productions, Inc. Prior to making the alleged contract, involved herein, each of the three corporations had entered into a written contract with defendant RKO Radio Pictures, Inc. Pursuant to provisions in each contract, each corporation had made a motion picture on defendant's lot and the pictures were distributed by defendant. Skirball, who was in charge of production of the pictures, occupied an office on defendant's lot. According to the testimony of Skirball, he "made the deal" for the second and third contracts with Sidney Rogell, who was the executive producer for RKO and was the "top man" on the lot. He was "second only" to Howard Hughes, who was "top man" in the RKO organization but had never been on the lot. Rogell, on behalf of RKO, negotiated for the purchase of stories and made commitments therefor, and he frequently employed actors and directors. He testified that it was his custom to obtain the approval of Mr. Hughes before purchasing a story; ordinarily he did not sign the contracts of employment or contracts for making pictures; they were usually signed by Gordon Youngman, who was vice-president in charge of the legal department and commitments; he (Rogell) negotiated the "production end" but not the "distribution end" of the three agreements (hereinbefore referred to); he did not read any of those agreements "through" and he did not sign contracts of that kind.

On March 21, 1950, while Skirball was making the picture

for Gwenaud Productions, entitled "Payment on Demand," Rogell asked him what picture he had that he would like to do next. Skirball stated that he had "Appointment in Samarra," but he was waiting to do that as a leader of a group of pictures. Rogell stated that he was sure he could not get an "O.K." from Howard Hughes to do more than one picture at a time. Skirball then stated that Gold Seal would consider making "Appointment in Samarra," and Rogell asked him to send a copy of the script. Thereupon a copy of the script was sent to Rogell. "Appointment in Samarra" is a novel written by John O'Hara which was published about 1932. It was a best seller in the United States. Also, it was translated into several languages and it sold well in foreign countries. A script for making a motion picture from that novel was prepared by Manning, vice-president of Gold Seal, who (according to testimony) "is considered one of the very top writers" in the motion picture industry. The average cost of a script by Manning was "around $150,000."

About March 26, 1950, Rogell told Skirball that he had read the script for Appointment in Samarra, that he liked it very much and would like to talk to him about it. About April 1, 1950, when Skirball was at Rogell's office, Rogell told him that he had talked with Hughes about the story, that Hughes liked the idea, and that he (Rogell) was ready to "start talking a deal" for the picture.

Skirball testified that after he had submitted the script to Rogell and prior to May 16, 1950, he had discussions with Rogell regarding "the extent of the rights in the literary material Appointment in Samarra" that Gold Seal was to convey to RKO; he explained to him that Gold Seal was obligated to pay John O'Hara 5 per cent of the profits of the picture; he also told him that when he signed the contract (with Mrs. O'Hara) he "advanced $10,000 to O'Hara plus the cost of the story," and that every year in which he did not make the picture he "had to pay another $10,000 which would go against the percentage," and up to that time he had advanced $30,000 which meant that O'Hara would not participate in the first $600,000 profit from the picture; he told Rogell that the first $25,000 which he paid O'Hara was "payment on the story," and the "next $10,000 from then on each year was to pay against the percentage of the picture," and his deal was that he had to make the picture and

that he could not sell the ''story'' outright without the consent of the agent with whom he made the O'Hara deal; they also had a conversation regarding the cost of the picture and they figured, with a normal cast, it would cost around $1,100,000.

Rogell asked Skirball how much he wanted. Skirball told him that Mark Hellinger had offered him $250,000 for the ''property'' and a percentage of the profits; that Robert Montgomery had offered him $150,000 for the book and 25 per cent of 95 per cent of the profits—the remaining 5 per cent of the profits was to go to O'Hara—and in addition that he (Skirball) was to get his regular fee of $50,000 for his work in producing the picture. Skirball then ''suggested a deal'' to Rogell of $225,000 and 10 per cent of the profits of the picture, and suggested an ''alternate deal'' of $175,000 and either 25 per cent or 40 per cent of the profits. Both of those deals including his services as producer, and he told Rogell that Gold Seal would stand the 5 per cent which was to go to O'Hara.

Rogell transmitted Skirball's offer to Hughes who said that those figures were too high. Skirball asked Rogell to discuss the offer with Hughes again and to dwell upon the Hellinger and Montgomery offers, and he stated that the deal he was offering RKO was predicated on the nice relationship with RKO, and he hoped to remain at RKO. Skirball asked Rogell to mention to Hughes that Skirball's agent was sure that he could make a deal with Paramount for Appointment in Samarra. A few days later Rogell called Skirball and told him that Hughes wanted to know if they could work out a deal to pay Gold Seal a lump sum and Gold Seal would get no percentage of the profits. Skirball stated that they were not interested in such a deal.

During the next few days Skirball and Rogell talked about the cast. Skirball mentioned Bette Davis, Sullivan, Ford, Andrews, and Ryan. During the last two weeks in April, 1950, Mr. O'Shea, president of Vanguard Films, told Rogell that Gregory Peck could be made available to RKO. Vanguard had a contract with Peck, and it could assign or lend his services. Rogell told O'Shea that he was negotiating with Skirball for ''Appointment in Samarra,'' and he would have to effect the Skirball deal before he could go ahead with such a deal with Vanguard. Rogell told Skirball that he had talked to O'Shea, and that Peck was available for the picture. Skirball replied that Peck was too expensive, that he understood that Vanguard wanted $250,000 for Peck, and that he

had heard that Peck did not want to be in the picture. Rogell said that it was the last picture on Peck's program for Selznick (Vanguard) and that he would make any picture. Rogell also said that Mr. Hughes was anxious to have Peck in the picture. Skirball said that he would just as soon have Robert Ryan, who was under contract with RKO. Rogell asked what deal could be worked out if they used Peck.

Thereafter, about May 10, Skirball "offered a deal" of $150,000 and 20 per cent of the profits, or $125,000 and 25 per cent of the profits; which offer was to be submitted to Hughes by Rogell. Rogell discussed the offer with Hughes, who told Rogell to offer to Skirball "Gregory Peck plus $100,000 and 25 per cent." Hughes also told Rogell to tell Skirball that he (Skirball) had had three deals with RKO wherein he had picked up over $300,000 in cash, that it was a rich deal with Peck, that RKO and Skirball had gotten along very well, and RKO wanted him to stay there and make pictures. Rogell transmitted that offer and message to Skirball, who refused the offer.

On May 14, O'Shea told Rogell that he (O'Shea) had a deal for Peck (with someone else) and that he would hold Peck until 9:30 o'clock that night. Later, that deadline for getting Peck was extended to May 16, at noon. On May 15, Skirball said that they could make a deal, if they would do it "now," for $150,000 plus 20 per cent or $125,000 plus 25 per cent; and that he (Skirball) would take $10,000 less with Peck, that is, $140,000 plus 20 per cent. Skirball also said that he would be happy with Peck but he would just as soon have Ryan. Rogell related the offer to Hughes, who replied: "You can close the deal with Skirball with Peck at $125,000 plus 20." On the morning of May 16, a "production meeting" was held in Rogell's office, which was attended by Rogell, Hastings (an assistant secretary of and attorney for RKO), Lockhart (general studio manager), and Youngman (vicepresident in charge of commitments). During the meeting Rogell called Hughes and told him there was "a new deadline, a noon deadline from O'Shea on Gregory Peck." He also told Hughes that Skirball agreed to $140,000 plus 20 per cent. Hughes told him to try for $125,000 plus 20. Rogell telephoned Skirball, who was on the RKO lot, and told him they were in a meeting and they had to make up their minds regarding Peck by noon of that day, and that Hughes had told Rogell to offer him $125,000 and 20 per cent of the

profits. Rogell also told him that if he would accept that they had a deal, otherwise they would not have Peck. Skirball started to argue, and Rogell asked him to come to the office. When Skirball arrived there, he said that he did not think it was a good deal. Rogell said that Hughes had asked him to say that Skirball had had a lush deal at RKO, that a future was there, and that if Skirball accepted this deal Hughes would make it up for Skirball on other pictures. Skirball said that he preferred Ryan. Rogell replied that Hughes had said that Skirball would make more money with Peck than with Ryan, and that with Peck Skirball's share of the profits should be half a million dollars. Rogell repeated the figures of the Hughes offer, and he also repeated the need for quick action if they were interested in Peck. Skirball asked Rogell, if outside the "particular terms of the picture," that is, the $125,000 and 20 per cent, the deal was to be exactly the same as "Payment on Demand [the Gwenaud picture]," and if the deal is a deal with or without Peck. Rogell replied, "Yes." Then Skirball stuck out his hand and said, "We have a deal." Then Rogell stuck out his hand and said, "We have a deal." Those present "shook hands all around."

Rogell then telephoned O'Shea and said that he had effected his deal with Skirball and that he wanted to close for Peck. O'Shea said that he reaffirmed the starting date (June 8), the number of weeks involved (12 weeks), and the price ($250,-000) ; and he said, "We have a deal and there is no more trading, this is it," because I now have to call the other customer and tell him there is no possibility of making a deal (with the other customer). Rogell said, " [T]his is the deal." Then he reported to those present (the committee) that he had secured Peck for the picture.

After Rogell had had said conversations with Skirball and O'Shea, he telephoned Hughes and advised him that he had closed with Skirball on the basis of $125,000 plus 20 per cent of the profits, and had closed on Peck for $250,000. Hughes replied, in substance, "O.K.," and told Rogell to publicize the deal.

At said morning meeting in Rogell's office or at a meeting there in the afternoon of that day, Skirball and Rogell discussed the budget for the picture. The previous total estimate was $1,100,000, which included $100,000 for the star of the picture. They added $150,000, the extra cost for Peck, to the previous estimate which made a total budget of $1,250,000.

About noon of May 16, after Hughes had told Rogell to

publicize the picture, Rogell advised Lieber, the publicity director of RKO, about the picture and told him to release publicity on it. On May 20, 1950, a publicity release by RKO News Service stated in part: ''Howard Hughes today completed negotiations to borrow Gregory Peck from David O. Selznick to star in the screen version of John O'Hara's Appointment in Samarra, which Jack Skirball and Bruce Manning will produce for RKO Radio.'' RKO placed an advertisement in the June 10th issue of the Motion Picture Herald, a weekly trade journal of national circulation, wherein it was stated that the picture would be produced by RKO. Also, in the June 10th issue of the RKO house organ, ''Flash,'' which was distributed among theater agencies, there was an advertisement which stated: ''And, looking ahead to 1951 . . . Appointment in Samarra, Gregory Peck starring in a dramatization of the best-selling novel by John O'Hara.'' Also, in the June 14th issue of Variety, a trade paper of national circulation, RKO placed ''a spread'' or advertisement similar to the ones in the other papers.

One of the duties of Youngman, a vice-president of RKO and an attorney, was to see that the legal department prepared the contracts. He signed most of the contracts on behalf of RKO. After the meeting on the morning of May 16, Rogell instructed Youngman to reduce the contract to writing. Youngman then prepared a document on a letterhead of RKO which was directed and delivered to Sidney Lipsitch, the resident attorney at the studio. The document stated that: ''A new deal has been negotiated with a corporation of Jack Skirball, Gold Seal Productions, for the production of a motion picture based upon the John O'Hara novel Appointment in Samarra. A screenplay has been submitted to the studio and approved. Gregory Peck is to portray the leading male role.'' The document also stated that Gold Seal Productions was to receive $125,000 and 20 per cent ·of the profits; that the $125,000 was payable in specified instalments; that ''All of the other terms and provisions are the same as those in the last contract [Gwenaud Productions, Inc. — ''Payment on Demand'']. . . . Mr. Skirball is very anxious to have the contract executed by the end of this week if possible. For this reason, will you please expedite the drawing of the agreement.'' The name of Youngman was typewritten on the document and he initialed the document and adopted and used his typewritten name thereon, and on the copies, as his signature. A copy of the document was sent to Hastings, Rogell and others

at the studio. Youngman prepared the document with the understanding on his part that Rogell had concluded the negotiations with Skirball.

Mr. Lipsitch delegated the writing of the contract to Mr. Knecht, another attorney in the legal department at the studio, who obtained a copy of the prior contract with Gwenaud Productions (referred to in Youngman's memorandum). He prepared a first draft of the contract, pursuant to Youngman's memorandum, without receiving any instruction from Skirball or any of plaintiff's representatives. RKO had a mimeographed form of production-distribution agreement, which form was used more or less for each picture. The legal department had a lot of the mimeographed pages. The first draft of the contract, made by Mr. Knecht, was ready on May 20, 1950. That draft followed substantially the provisions of two contracts which Skirball had previously negotiated with Rogell. The draft was submitted to George W. Cohen, attorney for plaintiff, by a letter of transmittal from Hastings in which it was stated that any enforceable agreement would be subject to the execution of a written contract.

On May 22 Cohen, Skirball and Hastings met at the studio and discussed suggestions which Cohen made regarding the draft. Some changes were made in the draft and on May 24 a second draft was submitted to Cohen. On that day Cohen and Skirball met with Hastings. Cohen said that he had checked the contract, that it was satisfactory and was in conformity with the deal, that as far as Gold Seal was concerned "this was the deal," that there were a few minor points which he would like to take up but they made very little difference to him and he did not care whether they were conceded. After he had finished going over those points, he reiterated that "this was the deal," that it was satisfactory. He said further that they wanted no more changes unless RKO wanted to give them. Hastings said that he understood that this was the contract, it was satisfactory, this was the deal, and the suggestions were not in the nature of counterproposals. When they started to leave, Hastings said that he understood there might be some question in Peck's mind as to whether he wanted to do the story. Cohen replied that it did not make any difference whether Peck wanted to do it, because the contract provided machinery for finding a substitute for Peck. Skirball said that he had a deal with or without Peck and that was his understanding with Rogell.

On May 24, about noon, a telegram from Peck addressed to

Hughes, "care of Gordon Youngman," was received by Youngman. The telegram indicated that Peck was reluctant to make the picture. About half an hour after receiving the telegram, Youngman read it to Skirball by telephone. Youngman also talked to O'Shea, who said that: he could not hold Peck without a contract; that Vanguard had the right to lend Peck and had lent him and would do all in its power to see that he performed the role; that he (O'Shea) wanted the lending papers, which he had sent to RKO, signed and returned to him. Youngman told O'Shea that "they" were reluctant to sign the papers in the face of a wire that had been sent by Peck to Hughes. O'Shea asked if RKO deemed that O'Shea was bound, and Youngman said, "Yes." O'Shea also said that he deemed that he was bound.

On May 25, Hastings, Skirball and Youngman held a conference regarding O'Shea's position. Youngman told Skirball that Hughes said the contract was not contingent upon getting Peck but he would not sign a commitment to be stuck for $125,000 unless he had some leading man approved in advance.

On May 27, Youngman and O'Shea had another conversation which was, in substance: that each one said he had a deal; O'Shea had submitted a contract which provided that RKO would pay for Peck's services whether or not he performed; in view of the facts that Peck had indicated he was loath to perform and his commitment with Vanguard was running out, RKO was afraid that O'Shea might not be able to force him to perform and RKO would not sign the contract unless O'Shea eliminated the clause that RKO had to pay whether or not Peck performed; and O'Shea refused to eliminate the clause.

On June 2, O'Shea said that he could not promise to hold Peck for RKO, that he might have to take a contract for his services elsewhere. On June 7, Youngman asked O'Shea if he could take out said clause, and O'Shea replied that he could not do it. On June 8, O'Shea said that he had heard that Hughes had released Peck, and that he (O'Shea) was going to try to make a deal to lend his services elsewhere. Youngman replied that Hughes had not released Peck. Later that day, Youngman told O'Shea that "we stood by the deal we had made without this clause in it." O'Shea said he would not accept Youngman's position. Then they "both decided that all the arrangement was off." On June 12, Vanguard sent a telegram to RKO terminating negotiations for Peck's services. O'Shea testified that Peck "was expressing unhappiness to

the fellows'' and was trying to effect a substitute for the picture, but he had not refused to make the picture. O'Shea testified further that if Peck had refused to perform under his lending agreement, Vanguard could have suspended him.

Thereafter, Youngman said that the problem as to who would play the lead in the picture might be solved if Skirball would submit other names to Hughes. Skirball said that he would do it as a favor, but he felt that if Hughes did not like the names suggested the matter could go to arbitration according to the contract. Skirball submitted several names to Youngman and Hastings, but he did not receive a reply regarding them. In February, 1951, Mr. Tevlin, who had become a top man at the studio, told Skirball that Hughes did not want the picture made for RKO, that the deal was out, and that Skirball should leave the RKO lot. Skirball left the lot. The picture was never produced.

After RKO had decided not to make the picture, plaintiff Gold Seal paid an additional $10,000 to Mrs. O'Hara in order to retain the motion picture rights another year. During that year Skirball and a motion picture agent tried to sell the picture rights to studios and others, but they were unable to get any offers. There was testimony by Mr. Work (plaintiff's witness), who was qualified to give an opinion as to the value of stories for use in motion pictures, to the effect that after RKO had so advertised the picture, and had cancelled the production of it, ''the property [picture rights and script]'' would have very little value, because no company wants to take another company's rejects, and no important artist or director as a general rule wants to become identified with a questionable production. When an additional payment of $10,000 became due to Mrs. O'Hara for the picture rights, the payment was not made and plaintiff Gold Seal lost the picture rights.

The court found, in part, as follows: Plaintiff was the owner of the picture rights in ''Appointment in Samarra'' and in a screenplay based thereon. On or about May 16, 1950, plaintiff and defendant entered into an oral contract for the production and distribution of a motion picture based upon the novel ''Appointment in Samarra.'' By the terms of said contract it was agreed, among other matters, that plaintiff would produce the picture and deliver it to defendant for distribution, and that defendant would pay to plaintiff $125,000 in cash and 20 per cent of the net profits from the distribution. By said contract the parties entered into an

arrangement in the nature of a joint venture. Thereafter defendant caused memorandums in writing of said contract to be prepared and subscribed by its duly authorized officers and agents. On May 20, 1950, defendant submitted to plaintiff a written memorial of said oral contract. The parties orally agreed to certain amendments thereto. About May 24, 1950, defendant submitted to plaintiff an amended written memorial of the oral contract which incorporated said oral amendments. Said memorial, a copy of which is attached as an exhibit to the complaint, sets forth all the terms of said oral contract. On said May 24, the parties orally approved the contract set forth in said exhibit, and they agreed that said exhibit sets forth the terms of the oral contract between the parties. Subsequent to the entry into said contract and pursuant thereto, defendant negotiated, and on May 16, 1950, entered into, an agreement with Vanguard Films, Inc., pursuant to which said Vanguard Films agreed to lend the services of Gregory Peck to play the leading male role in the motion picture "Appointment in Samarra." During June, 1950, defendant, pursuant to said contract, publicly announced and advertised in the press that defendant would release said picture, starring Gregory Peck, during 1951. As a result of such announcements and advertisements, defendant and Peck became associated with the proposed picture within the motion picture industry. By reason of such announcements and advertisements, and of the breach of such agreement, defendant destroyed the market value of the motion picture rights in said novel and the screenplay based thereon and rendered them valueless, except as to a picture which would be distributed by defendant. Defendant intentionally led plaintiff to believe that the parties had an oral contract for the production and distribution of a motion picture based upon said novel. Plaintiff relied thereon, and employees of plaintiff prepared a preliminary budget for the picture on the basis of a budget of $1,250,000 and in general began preparation for the production of the picture. On or about July 6, 1950, defendant wilfully breached said contract and refused to perform the same. On or about August 1, 1950, defendant expressly advised plaintiff that it would not go forward with the performance of said contract, and defendant repudiated said contract. Thereafter it became a matter of general knowledge within the motion picture industry that defendant had refused to go ahead with the production of the picture.

Plaintiff at all times has been ready, willing and able to perform said contract and has performed all conditions on its part to be performed, except as such performance has been prevented by the repudiation of said contract.

The court also found, in paragraph XIII of the findings, as follows: By reason of the acts of defendant, as stated in the findings, and by reason of the total destruction of the market for and value of the motion picture rights of said novel and the screenplay based thereon, plaintiff has suffered unjust and unconscionable injury and loss and has been damaged in the sum of $250,000. Said rights and screenplay had a reasonable market value of at least $250,000 at the time the oral contract was entered into and at all times thereafter and until defendant wilfully repudiated the contract. Said damages were within the contemplation of the parties and were the probable result of the acts of defendant. Said item of damage is separate and distinct from and in addition to the damages found in paragraph XIV.

The court also found, in paragraph XIV, as follows: By reason of the acts of defendant, as stated in the findings, and by reason of the repudiation of said contract, and by reason of the refusal of defendant to pay to plaintiff the $125,000 as provided in the contract, plaintiff has been damaged in the further sum of $125,000, with interest thereon from September 1, 1950, to the date of judgment in the sum of $22,486.55, which item of damage is separate and distinct from and in addition to the damage found in paragraph XIII. Plaintiff has been damaged in the total sum of $397,486.55.

The court also found: By reason of the acts of defendant, as stated in the findings, plaintiff lost and was deprived of 20 per cent of the net profits of said picture. There was no evidence from which it could be found that there was a reasonable certainty that there would be net profits, and there being insufficient evidence thereon the court makes no finding of the amount of net profits. Defendant is estopped to deny that plaintiff and defendant had a valid oral contract. Prior to May 16, 1950, plaintiff caused to be prepared a script based upon said novel, and on or prior to said date, plaintiff delivered a copy of the script to defendant. It is not true that the first draft of the proposed memorial of the oral contract was submitted by defendant to plaintiff as a basis for further negotiation with respect to the terms of a contract between them. The first draft was prepared by an attorney for defendant who had no authority to fix the terms of the

contract, and the draft was prepared by him upon the assumption that the provisions thereof would be subject to further discussion. It is true that on submission of the first draft an officer of defendant advised plaintiff that no enforceable contract between the parties would exist until the agreement had been reduced to writing and executed by the parties. Said officer was not authorized to impose such condition, and such condition was contrary to the oral agreement entered into on said May 16. A second draft was prepared by defendant incorporating changes requested by plaintiff in order to memorialize the oral contract entered into between the parties. The officer of defendant participating in said discussions (regarding the changes) had authority to make such changes and bind defendant thereto. It is not true that the oral contract is invalid or unenforceable under the provisions of section 1624, subdivision 1, or 1624a, subdivision (1), of the Civil Code or section 1973, subdivision 1, or 1973a, subdivision 1, of the Code of Civil Procedure (statute of frauds). Defendant is estopped to rely upon said sections or any of them. The parties entered into a contract on May 16, 1950, with the mutual intention that such contract should thereupon become binding. At the time the parties entered into the oral contract on May 16, 1950, it was contemplated by them that a written memorial thereof would be prepared and executed by them.

Appellant contends, as above stated, that the evidence was insufficient to support the finding that the parties entered into a contract. It concedes that the basic terms of such a contract, namely the story, leading actor and money consideration, were agreed upon. It argues, however, that the alleged agreement of May 16 left various terms of the final contract open for future agreement; and the parties did not intend to be bound until a written contract was signed. Some of the terms which, appellant asserts, were left open were: the starting date; budget; director and principal cast; minor revisions of the script; assignment of television, radio, and stageplay rights to the novel; approval by Mrs. O'Hara of assignment of rights to RKO; which party had the responsibility of computing and paying (delivering) the 5 per cent of profits to Mrs. O'Hara; schedule of "submissions and approvals" of personnel. With reference to those terms, which allegedly were left open, appellant refers to the Gwenaud contract (the pattern of which allegedly was to be followed herein) and

states in effect that provisions therein, regarding terms allegedly left open herein, manifestly were not applicable to the present case by reason of different dates, names, amounts, etc., and therefore that the parties in the present case must have contemplated further agreement as to those matters.

With reference to the parties not intending to be bound until a contract was signed, appellant argues that the words "we have a deal" were ambiguous and did not import a present agreement; that the unexpressed subjective intent of the parties was immaterial; and that the surrounding circumstances showed that the parties did not intend to be bound immediately. As to the words "we have a deal," appellant asserts that they meant that the parties had agreed upon the basic points (story, star and money) and that the other points were details as to which, it was anticipated, the parties could agree without difficulty; but that a formal agreement would be prepared. It asserts further that the words were ambiguous in that it could not be determined therefrom whether the parties were not to be bound until the formal agreement was signed, or whether they were to be bound immediately and that the formal agreement to be prepared would be a memorial of their present agreement. As to the unexpressed subjective intent of the parties, appellant is referring to testimony of Skirball and Rogell to the effect that they "felt" or "understood" the parties were "bound" or "committed" when they said they had a deal and then shook hands; and appellant is also referring to the testimony of Rogell to the effect that the handshaking was "in a manner in which you shake hands when you have concluded a deal." As to surrounding circumstances which, according to appellant, showed that the parties did not intend to be bound immediately, appellant refers to: legends on letterheads of RKO (in prior dealings) to the effect that RKO was not to be bound before signing; statements in two prior negotiations that RKO would not be bound before signing; statute requiring a writing; large amount of money involved; provisions that the time for doing various acts was measured from date of executing or signing; provisions in the written agreement indicating a concern against being bound by agreements or approvals resting in parol; negotiations continuing after May 16; prompt delivery of draft of agreement (on May 20); statement of Skirball, in applying for permit to issue securities, that Gold Seal was about to enter into an agreement with RKO; Youngman's memorandum, directing preparation of contract, which

used the word "negotiated" (in the expression "A new deal has been negotiated") which allegedly meant that RKO was about to enter into a contract; a letter to Mrs. O'Hara from RKO stating, "Providing our agreement with Gold Seal is executed," which letter was approved in writing by Skirball; Hastings' letter advising Cohen that the agreement was not binding until signed. Appellant asserts further that the parties must have intended to secure the consent of Mrs. O'Hara to assignment of rights to RKO; and they intended to secure a permit to issue securities.

As above stated, the court found that on May 16 the parties entered into an oral contract, with the mutual intention that it should thereupon become binding, and at that time the parties contemplated that a memorial thereof would be prepared and executed; on May 24 a memorial, setting forth all the terms of the oral contract, was orally approved by the parties; the second draft of the agreement (May 24), incorporating changes in the first draft (May 20), was prepared in order to memorialize the oral contract entered into between the parties. The parties had entered into prior contracts, including the Gwenaud contract. Appellant concedes that on May 16 the parties agreed orally upon the basic points of the contract (story, star and money) and that the other points were details which the parties anticipated could be agreed upon without difficulty. The other points or "details" were to follow the pattern of the Gwenaud contract. (Youngman's letter to the resident attorney of RKO, directing him to draw the agreement herein, stated that "All of the other terms and provisions are the same as those in the last contract [Gwenaud contract].") The first draft of the contract (May 20) was prepared by an attorney for RKO, who had not obtained any information from a representative of Gold Seal. The legal department of RKO had mimeographed forms for such proposed written agreement, and such forms had been used in the prior contracts with Gold Seal. Those forms, which were used in preparing the contract herein, contained terms that were variable with respect to certain points, such as the starting date and budget. Some examples as to such variable terms are: the provision as to starting date, in the Gwenaud contract, is that the principal photography will commence between December 15, 1949, and January 15, 1950; the provision therein as to budget is that RKO may not disapprove a proper budget which does not exceed

$1,200,000 ''as such sum may be adjusted as herein provided.'' There was evidence that Cohen, the attorney for Gold Seal, and Hastings, assistant secretary of RKO who submitted the contract to Gold Seal, said on May 24 that the second draft of the contract was satisfactory.

During a few weeks preceding May 16, Skirball, president of Gold Seal, and Rogell, the top man on the RKO lot, negotiated regarding the production of the picture. During that time there were proposals and counterproposals pertaining to the amount to be paid by RKO, and who should be selected to play the leading role. About two days before May 16, O'Shea, who was president of Vanguard, told Rogell that, as to the matter of getting Peck, there was a deadline until May 16 at noon. Rogell gave that information to Hughes and Skirball. On May 15, Rogell advised Hughes as to an offer Skirball had made. Hughes told Rogell ''You can close the deal with Skirball with Peck at $125,000 plus 20'' per cent of the profits. On the morning of May 16, at a conference of RKO executives in Rogell's office, Rogell telephoned Skirball and advised him as to Hughes' offer, and invited Skirball to come to the office. When Skirball arrived there, Rogell gave him a message from Hughes to the effect that Skirball had had a lush deal at RKO, he had a future there, he would make more with Peck than with Ryan, and Skirball's profit with Peck should be half a million. Rogell also repeated the need for quick action if they were interested in Peck. In response to a question by Skirball, Rogell said that the deal, except the $125,000 and 20 per cent, was to be the same as the last contract (Gwenaud picture). Then they shook hands and each one said, ''We have a deal.'' According to Rogell, they shook hands ''in a manner in which you shake hands that you have concluded a deal.'' Then Rogell telephoned O'Shea and they made an oral agreement whereby Vanguard would lend Peck to RKO for $250,000 for 12 weeks, starting June 8. Thereupon Rogell advised Hughes that he had closed the deal with Skirball for $125,000 plus 20 per cent, and he had closed the deal on Peck for $250,-000. Hughes replied ''O.K.,'' and told him to publicize the deal. Thereafter RKO placed paid advertisements in magazines of national circulation, wherein it was stated in substance that RKO would produce the picture, starring Peck.

It is to be noted that Rogell made notes, during or immediately after his conversations with Hughes, Skirball, and O'Shea; the notes pertained to the conversations, were used by Rogell while he was a witness, and were received in evidence.

Some of his notes were as follows: "H. says close at 125 plus 20." "J. S. accepted 5/16." "5/16 called H. during meet'g—Noon deadline—from O'Shea on G. Peck. Told H. J. Skirball agreed to 140 plus 20%. H. said try for 125 plus 20. Called J S to meeting. He agreed on 'phone. Then came up in person. All OK." "Called O'Shea—closed on Peck at $250 5 6/8 —12 wks—subseq. wks. at $15,000—Dan will prepare & send his contract." "5/16/50 H. OK'd 125 plus 20 J.S. accepted." (In those notes the H. refers to Hughes; J. S. to Skirball; and Dan to O'Shea.)

In *Mancuso* v. *Krackov*, 110 Cal.App.2d 113, 115 [241 P.2d 1052], it was said: "[I]t is not necessary that each term [of an oral contract] be spelled out in minute detail." In *Thompson* v. *Schurman*, 65 Cal.App.2d 432 [150 P.2d 509], it was said at page 440: "The rule is well established and uniformly followed that when the respective parties orally agree upon all the terms and conditions of a contract with the mutual intention that it shall thereupon become binding, the mere fact that a formal written agreement to the same effect is to be thereafter prepared and signed does not alter the binding validity of the original contract. . . . The question as to whether an oral agreement, including all the essential terms and conditions thereof, which according to the mutual understanding of the parties is to be subsequently reduced to writing, shall take effect forthwith as a completed contract *depends on the intention of the parties,* to be determined by the surrounding facts and circumstances of a particular case." *Columbia Pictures Corp.* v. *DeToth,* 87 Cal.App.2d 620 [197 P.2d 580], was an action for declaratory relief—the plaintiff Columbia contending that it and defendant DeToth had entered into an oral contract whereby DeToth agreed to render services as a director. Prior to making the contract there involved, the parties had entered into a written contract regarding another matter. Columbia had a standard form of contract which it used for directors, and at the time the parties were discussing the contract involved in that case DeToth understood that they were discussing the standard form of contract. After DeToth and a representative of Columbia had had some discussion regarding the new contract involved therein, wherein the essentials of a contract were stated, a representative of Columbia asked DeToth if he agreed, and he replied "Yes." Then said persons shook hands and one of them said "This is a deal." DeToth also said that he would sign a contract when he was "free of" another agent. The court said at page 629:

"[W]hen the respective parties orally agree upon all of the terms and conditions of an agreement with the mutual intention that it shall thereupon become binding, the mere fact that a formal written agreement to the same effect is to be prepared and signed does not alter the binding validity of the oral agreement. . . . Whether it was the mutual intention of the parties that the oral agreement should be binding *eo instante* is to be determined by the surrounding facts and circumstances of a particular case and is a question of fact for the trial court." In the present case the findings with respect to the making of the oral contract are supported by the evidence.

█ Appellant also contends that Rogell did not have authority to bind RKO. It states in its brief that Rogell was not one of the persons authorized by the directors of RKO to execute contracts, but the persons holding that authority were Youngman and Hastings. Rogell was the "top man" on the RKO lot. Skirball testified that Rogell "was the boss of the studio" and "seemed to have complete authority"; and that it was with Rogell alone that he made prior deals for two pictures. In the present case, it appears that Hughes gave Rogell authority to make the offer to Skirball, and to close the deal with him. It also appears that Hughes approved the deal which Rogell had made. Hughes told Rogell to close with Skirball with Peck for $125,000 plus 20 per cent. When Rogell told Hughes that he had closed the deals with Skirball and O'Shea, Hughes replied "O.K." There was sufficient proof that Rogell had authority to bind RKO.

Appellant contends that the action was barred by the statute of frauds. It argues that the alleged contract could not be performed within a year. Section 1624 of the Civil Code (statute of frauds) provides: "The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent: 1. An agreement that by its terms is not to be performed within a year from the making thereof; 2. . . ." Respondent argues that said section does not apply to the contract herein. It argues that the contract could have been performed within a year; that the transaction was a joint venture which was partly performed (by paid advertisements and acquiring the services of Peck), and therefore the statute of frauds was not applicable. █ Irrespective of whether the contract herein is a kind of contract referred to in the statute of frauds, it appears that there was a sufficient memorandum of the contract within the provisions of the statute. The

memorandum above referred to, written by Youngman on May 16 directing the resident attorney to prepare a written contract, was a sufficient memorandum. Youngman was vice-president in charge of commitments and of the legal department, and was authorized by the directors to execute contracts on behalf of RKO. The memorandum (except the date and heading) was as follows:

"A new deal has been negotiated with a corporation of Jack Skirball, Gold Seal Productions, for the production of a motion picture based upon the John O'Hara novel APPOINTMENT IN SAMARRA.

"A screenplay has been submitted to the studio and approved. Gregory Peck is to portray the leading male role.

"Gold Seal Productions is to receive the sum of $125,000.00 plus 20% of the profits. The sum of $125,000.00 covers the basic story, screenplay, and individual producer's services. It is payable as follows: . . . [Here is statement of installments.]

"All of the others terms and provisions are the same as those in the last contract . . . [Gwenaud contract].

"Mr. Skirball is very anxious to have the contract executed by the end of this week if possible. For this reason, will you please expedite the drawing of the agreement.

"GORDON E. YOUNGMAN

"CC—Messrs. Rogell, Lockhart, Hastings, Harbin, Bender."

As above stated, Youngman initialed the memorandum and adopted his typewritten name thereon as his signature. ■ A typewritten name may be adopted as a signature. (*Kadota Fig Assn.* v. *Case-Swayne Co.,* 73 Cal.App.2d 815, 819 [167 P.2d 523]; see *Marks* v. *Walter G. McCarty Corp.,* 33 Cal.2d 814, 820 [205 P.2d 1025].) ■ It thus appears that the memorandum contained the basic terms of the contract (names of parties, name of picture, screenplay had been approved, name of leading actor, amounts to be paid, all other terms same as a prior contract [Gwenaud]). The Gwenaud contract, referred to therein, contained 84 mimeographed pages; and it may be stated generally that it contained the usual provisions regarding the details of an agreement for the production and distribution of a motion picture. It appears that the memorandum, which included the basic terms of the contract and stated that the other terms were the same as the Gwenaud contract, was in practical effect a complete statement of the terms of the contract. It should be noted

that the attorney for RKO prepared the first draft or memorial without securing any information from a representative of Gold Seal. ■ ''It is well established that a note or memorandum under the statute of frauds need not contain all of the details of an agreement between the parties.'' (*Gibson* v. *De La Salle Institute*, 66 Cal.App.2d 609, 627 [152 P.2d 774].) Furthermore, in the present case the court found, upon sufficient evidence, that defendant was estopped to rely upon the statute of frauds.

■ Appellant asserts that the court erred in permitting Skirball to answer a question as to whether it was his intention to enter into a binding contract at the time he and Rogell shook hands and said they had a deal. He answered that he felt that they definitely had a deal. Under the circumstances here, the ruling was not error. On the morning of May 16 the parties were confronted with a ''noon deadline,'' set by O'Shea, with respect to getting Peck. As stated by Rogell, he repeated to Skirball, on that morning, ''the need for quick action.'' It was important, of course, that Rogell know whether RKO and Gold Seal were in agreement regarding the picture before he closed with O'Shea for Peck to be an actor in the picture. The significance of shaking hands, under such circumstances and following the conversation hereinbefore mentioned, and at the same time saying ''We have a deal,'' was material. The intention of the persons who shook hands and used those words, under such circumstances, was material. The testimony of both persons, with respect to intention, was to the same effect—that they intended to close the deal.

■ Appellant asserts further than the court erred in excluding evidence as to the time required by RKO for proper distribution of a picture such as the one contemplated here. It argues that the evidence would have established that the picture could not have been distributed within a year; and that therefore the alleged contract would come within the statute of frauds. Even if it be assumed that the ruling was error, it was not prejudicial since there was a sufficient memorandum to satisfy the statute of frauds.

■ Appellant asserts further that the court erred in rejecting evidence as to the parties' understanding of the word ''negotiated,'' as used in a memorandum of Youngman in a prior transaction between the parties. The memorandum in the prior transaction stated: ''Mr. Rogell has negotiated a new deal. . . .'' It does not appear that the circumstances in the prior transaction, with reference to the use of the word

"negotiated," were similar to the circumstances here. The ruling was not error.

Appellant asserts further that the court erred in not permitting defendant to inquire as to oral contracts Rogell claimed to have made on its behalf. Even if it be assumed that the ruling was error, it was not prejudicial in view of evidence herein that Hughes gave Rogell instructions as to this transaction and also approved the acts of Rogell.

Appellant also contends that the award of damages was improper. It argues that the evidence does not support the following findings: (1) that the picture rights and screenplay had a reasonable market value of $250,000 at the time the oral contract was made; (2) that the picture rights and screenplay were rendered valueless by acts of the defendant; and (3) that such damages (resulting from destruction of value of the rights and screenplay) were within the contemplation of the parties. Appellant also argues that the court applied an erroneous measure of damages, in that, it allowed $250,000 as damages for the loss of the total value of the rights and screenplay and it also allowed $125,000 as the purchase price of the rights and screenplay, thereby allowing double damages; also that $25,000, which was to be the salary of Skirball, should not have been allowed.

With reference to the finding that the reasonable market value of the picture rights and screenplay was $250,-000, there was evidence that the book "Appointment in Samarra" was a best seller and was written by one of the great American novelists. Also Mr. Work, who had been in the motion picture business 37 years and had been in charge of production at Universal Pictures for eight years and had approved every story that was used there during that time, testified that the reasonable value of the picture rights and screenplay was $300,000 plus a participation of 5 or 10 per cent of the gross profits or a larger percentage of the net profits. Also Skirball, who had been a motion picture producer for 15 years and had produced over 250 pictures, testified that the rights were worth $250,000 and that the script was worth $150,000, making a total value of $400,000. Also, the value of the rights and script was indicated by the testimony of Mr. Rogell to the effect that Mr. Hughes said that Skirball's 20 per cent of the net profits should be half a million. The evidence was sufficient to support said finding as to reasonable value.

With reference to the finding that the picture rights and screenplay were rendered valueless by acts of the defendant, the defendant, which was one of the major picture companies, advertised extensively that it would produce the picture, and thereafter did not produce it. Mr. Work, who as above stated had extensive experience in the production of motion pictures, testified that no company wants to take another company's rejects; that no important artist or director, as a general rule, wants to become identified with a questionable production; that after defendant had so advertised the picture, and had cancelled the production of it, the rights and screenplay would have very little value and it would be very difficult to negotiate an outright sale—there might be a deal on a deferred payment basis, but he thought that the property (rights and script) "had lost all of its value." Skirball testified that he and a motion picture agent made efforts to resell the rights and script but they were unable to get any offers; that in his opinion said advertising of the picture and the subsequent refusal of defendant to produce the picture made the picture rights and script worthless. The trial judge stated, in his oral opinion at the close of the trial, that Skirball and his agent "took the proper steps in their attempt to sell what they had." The evidence was sufficient to support the finding that the rights and screenplay were rendered valueless by acts of the defendant.

With reference to the finding that such damages were within the contemplation of the parties, there was the testimony, above mentioned, of two experts in producing motion pictures to the effect that as a result of such advertising and the refusal to produce the picture the rights and script were of no value. The trial court could have inferred from the evidence herein that defendant knew or should have known, by reason of its major position in the motion picture industry, that such result might follow its refusal to produce the picture. Also, defendant knew that Gold Seal, in order to retain the picture rights, was required to pay to Mrs. O'Hara $10,000 each year until the principal photography was commenced. The court also found, upon sufficient evidence, that defendant wilfully and intentionally breached the contract. The finding that such damages, regarding the loss of the rights and script, were within the contemplation of the parties is supported by the evidence.

With reference to the alleged erroneous measure of damages, appellant argues: (1) That the $125,000 item of damage,

which was the agreed payment to be made by RKO, should have been reduced by $25,000, the amount which was to be paid to Skirball for his services as producer of the picture, which services he did not perform. (The memorial of May 24 [second draft of the contract] provided that $25,000 of the $125,000 was for services of Skirball as producer.) (2) That even if it be assumed that the $250,000, which the court allowed for the loss of the total value of the rights and script, could be recovered, it was error to allow both the purchase price of $125,000 and the full value of the rights and script. (3) That plaintiff sold an 80 per cent interest in the rights and script to RKO and retained a 20 per cent interest therein, and since plaintiff elected to recover the purchase price, plaintiff was not entitled to recover for any loss in the value of the 80 per cent which it had sold and no longer owned; and accordingly plaintiff's recovery, at the maximum, could be no more than $100,000 (the remainder of the $125,000 after deducting Skirball's salary of $25,000) plus 20 per cent of the alleged loss in value (that is, 20 per cent of the $250,000 total value, as found by the court, or $50,000); making a recovery of $150,000. Appellant also argues that even if the $125,000 were only partial consideration for the rights and script, there is still a duplication of award of damages since the $250,000 is the award of damages for the total value of the rights and script, and to allow any part of the purchase price in addition to the total value is allowing a double recovery to the extent that a part of the purchase price is allowed as damages.

Respondent argues that the $125,000 was not the purchase price of the rights and script or the full consideration which defendant was to pay to Gold Seal; that as additional compensation defendant agreed to pay to Gold Seal 20 per cent of the profits; that as further consideration defendant was to make available to Gold Seal its (defendant's) technical experts, equipment, financial means to the extent of $1,250,000, and to be the distributor of the picture. Respondent also argues that as a result of defendant's wilful breach of the contract defendant suffered two separate losses, as follows: (1) loss of the production-distribution agreement; and (2) loss of the rights and script. Respondent refers to the fact that Skirball refused a larger flat or lump sum in lieu of a percentage of the profits, and then asserts that since the contract payment of $125,000 was not the full consideration to Gold Seal, and since Gold Seal suffered extensive additional damage in the loss of

the rights and script, the damages awarded should include not only the contract payment but the value of the rights and script which were destroyed. Respondent also asserts that awarding the contract price of $125,000, in addition to awarding $250,000 for loss of total value of the rights and script, was proper because such loss of value was in effect expense incurred in preparation for performance of the contract. (In connection with such assertion, respondent refers to *Walpole* v. *Prefab Mfg. Co.*, 103 Cal.App.2d 472 [230 P.2d 36], at page 482, wherein it is said: "Expenses incurred in anticipation of, or preparation for, performance, ordinarily are a recoverable element of damage for breach of contract.")

The court found, as above stated, that the memorial of May 24 (second draft of the contract), a copy of which is attached as an exhibit to the complaint, sets forth all the terms of the oral contract of May 16. The memorial states, with reference to the $125,000, as follows: " . . . Distributor will pay the Producer the sum of . . . ($125,000.00) as consideration for the story, the screenplay referred to in Article 6 of this Section I, any additional writing in connection with the completion and revision of said screenplay by the Producer, the compensation of the Individual Producer, and as partial consideration for the execution of this agreement." That provision, standing alone, bears the interpretation that the $125,000 was to be full payment for the rights and the script, and also the full payment for any rewriting of the script, and for salary of producer (Skirball) ; and that it was also part payment for executing the agreement. In other words, with respect to the rights and the script, that provision could be interpreted as meaning that the purchase price of the rights and script was included in the $125,000. It is to be noted, however, that the $125,000 is also in part payment for executing the agreement. At another place in the agreement it is stated that RKO will also pay Gold Seal 20 per cent of the profits. In determining the consideration for the contract reference may be made to the oral evidence. The negotiations between the parties related principally to the amount to be paid for the rights and script, and there was evidence that Skirball would not accept an offer of a lump sum but he did accept an offer of $125,000 plus 20 per cent of the net profits. Although the said provision of the agreement, above quoted, recites in part that RKO will pay $125,000 "as consideration" for the rights and script (and other things), when all the provisions of the memorial are considered in connection with the prior negotiations it appears

that the 20 per cent of the net profits was a part of the consideration for the rights and script. In any event, under either of the interpretations as to consideration, a part of the consideration for the rights and script was included in the $125,000. It therefore appears that since $250,000 was awarded as damages for the reasonable market value of the rights and script, and since $125,000, the amount to be paid under the contract, was awarded as additional damages, there was an award of double damages with respect to the rights and script to the extent that a part of the consideration for the rights and script was included in the $125,000. Under the evidence herein it cannot be determined what portion of the $125,000 was consideration for the rights and script. As above shown, the memorial provided that $25,000 of the $125,000 was compensation for Skirball. It is true that he did not render the services which it was contemplated he would render. It appears, however, from the memorial that Gold Seal had entered into an agreement with Skirball whereby he agreed to render his services as producer of the picture. In view of such obligation to Skirball, a proper element of Gold Seal's damage was the $25,000 which, under defendant's contract with Gold Seal, was to be Skirball's compensation.

Appellant and respondent rely upon *Overstreet* v. *Merritt*, 186 Cal. 494 [200 P. 11], in which the plaintiff sought damages for breach of an oral contract for (1) loss of his business, and (2) for loss of prospective profits. The agreement was that if plaintiff would dispose of his business in Illinois and engage in a cattle raising business with defendant in California, defendant would provide land and money for the new business and they would share the profits. Defendant represented that there would be large profits. Plaintiff abandoned his business and rendered services in connection with the proposed new business for 22 months, but defendant failed to establish the new business and to perform the contract. During that time defendant paid a salary of $500 a month to plaintiff and advanced $5,387.46 to him, making a total of $16,387.46. It was held therein that no damages for loss of profits should be allowed because such prospective profits were too speculative. The court said therein (p. 505) that the trial court adopted the proper measure of damages "in the absence of any means of determining the value of prospective profits of the contemplated business; this was the loss sustained by the plaintiff in preparing to carry out his part of

the contract, less the advances of money shown to have been made to him by the defendant.'' The court found that plaintiff had been damaged in the sum of $50,000 over and above the amounts received by plaintiff. Appellant RKO herein cites that case in support of its argument that respondent may not recover both the amount to be paid under the contract and the total value of the rights and script. Respondent Gold Seal refers to a statement by the court therein (p. 502) that: ''The defendant in any event should be estopped from disputing that the profits of the new business would have at least recouped the loss of the old.'' Respondent herein also says that the case does not hold that plaintiff could not have recovered a contract payment in addition to damages for the loss of plaintiff's business if such a payment had been provided for in the agreement. In the present case the court applied the rule, stated in the Overstreet case, that speculative profits cannot be allowed. Also, in the present case the court allowed damages for loss of the total value of the rights and script; in the cited case the court allowed damages for total loss of business. It is to be noted that there was no award of double damages in the cited case.

With reference to appellant's claim that it acquired an 80 per cent interest in the rights and script and that respondent had only a 20 per cent interest therein (and consequently respondent should not have an award for the entire value of the rights and script [$250,000] but only 20 per cent thereof [$50,000]), it is to be noted that, according to the memorial, appellant was not to have an interest in the rights and script until principal photography was commenced. Since there was no photography, appellant had no interest in the rights or script.

Plaintiff is entitled to recover the reasonable market value of the rights and script, as found by the court, in the amount of $250,000; and to recover the $25,000 which was provided as compensation for Skirball, with interest on the $25,000 from September 1, 1950, to date of judgment in the amount of $4,497.31 (this amount being 1/5 of the interest of $22,486.55 stated in the judgment to be the interest on $125,000). The award of $125,000 should be reduced to $25,000. The judgment should be modified accordingly.

The judgment is modified by reducing the award of $375,-000 therein stated to $275,000, and by reducing the amount of interest therein stated ($22,486.55) to $4,497.31, and by

reducing the total amount of the judgment therein stated ($397,486.55) to $279,497.31. The judgment, as so modified, is affirmed. Each party to pay its costs on appeal.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied August 31, 1955.