REPROSYSTEM, B. V. and N. Norman Muller, Plaintiffs,

v.

SCM CORPORATION, Defendant.

No. 77 Civ. 5705 (RWS).

United States District Court, S. D. New York.

June 30, 1981.

Hale, Russell, Gray, Seaman & Birkett, New York City, for plaintiffs; Selvyn Seidel, Lee A. Pollock, New York City, of counsel.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, for defendant; Peter Fleming, Jr., John E. Sprizzo, Jamie V. Gregg, New York City, of counsel.

## OPINION

SWEET, District Judge.

This action was filed by plaintiffs Reprosystem, B. V. ("Reprosystem") a Netherlands corporation, and N. Norman Muller ("Muller"), a New York resident, against the defendant SCM Corporation ("SCM"), a New York corporation. The complaint alleged damages for breach of contract, promissory estoppel, failure to perform and to negotiate in good faith, unjust enrichment, and fraud under the federal securities law and the common law. After extensive discovery, a four week trial before the court was held in the course of which 17 witnesses testified and well over 1,000 documents were introduced into evidence. At issue are the rights and liabilities of the parties arising from an unsuccessful effort in 1976 by Muller and Reprosystem to purchase the European photocopier business of SCM. Both sides were represented by extremely able counsel, not only during the events giving rise to the litigation but particularly during its trial. The issues presented, both factual and legal, constitute an almost exhaustive pathology of an important corporate transaction. For reasons more fully set forth below, Reprosystem and Muller are entitled to recover certain of their damages resulting from SCM's breach of contract and failure to bargain in good faith.

## FINDINGS OF FACT

*The Parties*

SCM is a multinational conglomerate manufacturing and distributing a number of industrial, commercial and consumer products. Its shares are listed on the New York Stock Exchange. Prior to 1975 and during 1976 and the first half of 1977 it engaged in the business of marketing, leasing and servicing office copiers, paper and toner throughout Western Europe, the Middle East and Africa. This business was conducted by its International Business Equipment Division through six wholly owned subsidiaries: Smith-Corona Marchant, S.A., a French corporation; SCM International S.A., a Belgian corporation; SCM (Switzerland) S.A., a Swiss corporation; SCM (Deutschland) GmbH, a German corporation; Smith-Corona Marchant International S.A., a Swiss (Chur) corporation; and SCM (United Kingdom) Ltd., a United Kingdom corporation. (These six subsidiaries are collectively referred to as the "copier subsidiaries" or "subsidiaries.") During the 1976 fiscal year (ending June 30, 1976) the copier subsidiaries had assets of about $17,000,000, total sales exceeding $40,000,000, operating profits exceeding $4,000,000, and approximately 1000 employees.

Reprosystem was organized in the fall of 1976 to hold the shares and assets of the subsidiaries. Its shares were owned by Reprographex Antilles, N.V., a Dutch Antilles corporation which in turn is a wholly owned subsidiary of Reprographex International, Inc., a Delaware subsidiary of MacMuller Industries, Inc., another Delaware corporation. At the time of the transaction, a majority interest of Reprographex International, Inc. was owned by Muller individually. Muller also owned a controlling interest in MacMuller Industries, Inc. which during most of the period in question owned and

operated Eagle Shirts, Inc. and Petrocelli Clothes, Inc. Muller was responsible not only for his own conduct as an individual but for that of the corporations which he controlled. He was an experienced businessman with "ability to raise cash."

*The Preliminaries*

Late in 1975 at a corporate planning meeting in Bermuda, Paul Elicker, the President and Chief Executive and Chairman of the Board of SCM ("Elicker") and Herbert Egli, the Vice President—Finance and Controller of SCM, ("Egli") and presumably others concluded it was in SCM's best interest to divest itself of its European copier business. This decision was communicated to Frank DeMaio, Vice President and General Manager of the International Group ("DeMaio").

The business of the subsidiaries consisted principally of the distribution of zinc oxide coated paper photocopiers, generally through lease of copier equipment, and sometimes through sale. Under the lease method, the subsidiaries would lease and service equipment, and this equipment was identified as Equipment Held for Lease. The subsidiaries also marketed paper supplies and toner to equipment users, and serviced the equipment. Between 1972 and 1974 annual operating profits of the copier subsidiaries ranged from about $4 million to about $5 million. DeMaio and Elicker sought out potential purchasers of this business, principally among its suppliers, without success. Through DeMaio a firm specializing in bringing together those interested in buying and selling corporate interests learned of the SCM purpose and advised Muller, who met first with DeMaio and then with Elicker and DeMaio in April, 1976. At the outset Muller and DeMaio had an understanding that if the proposed sale was accomplished DeMaio would receive an equity interest in the acquiring company. In May a meeting was attended by Muller, Elicker and William Rodich ("Rodich"), President of the Business Equipment Division of SCM of which the International Group and the copier subsidiaries were a part. The business of the subsidiaries was described. Muller was provided with a statement of the asset value of the subsidiaries as of March 31, 1976, showing an aggregate book value of $16.8 million on an unaudited basis. The current profit and loss statement, also provided to Muller, showed a nine month profit of about $3.0 million.

A subsequent review by SCM's accounting department indicated that this unaudited statement might have been overstated by $1 million. However, there is no evidence that, if the asset value was indeed overstated, the overstatement was deliberate and for a fraudulent purpose. The full disclosure offered to Muller and his accountants by SCM in the fall of 1976 also serves to refute any fraudulent purpose. A projected drop in operating profits in fiscal 1976–1977 for the subsidiaries of less than $600,000 was not disclosed.

Although not expressed in writing initially, both parties had certain underlying concerns. SCM desired to divest itself of the business, to protect against any further liabilities either on bank or employee severance guarantees, and to protect its good will and relationships with customers and suppliers since it intended to remain in the typewriter business. Muller sought to purchase an ongoing business and its distribution network with its capacity to introduce new items. Early in the discussions it was recognized that the availability of a plain paper copier as opposed to a zinc oxide coated paper copier was an important, if not vital, aspect of the business. SCM, having decided to get out of the copying business, sought to minimize its commitment to this new product, while Muller believed a plain paper copier essential to the continuation of the business. Rodich and DeMaio had concluded that the availability of plain paper copiers was necessary, regardless of the ownership of the business, and during the spring of 1976 DeMaio travelled to Japan and reached a preliminary understanding with Mita, a Japanese manufacturer, to provide plain paper copiers for SCM's benefit. These underlying concerns of the parties were articulated and under-

stood but not made the subject of any writing at this early state.

By letter of May 7, 1976, Muller offered to pay $9.0 million for the subsidiaries. His letter also contained the following language, which forms a keynote to SCM's position on the law:

This offer is made subject to the following conditions:

1. that a satisfactory audit review will be performed by our accounting firm, S. D. Leidesdorf & Co.

2. that a formal agreement, which is satisfactory to SCM and ourselves be entered into.

Rodich informed Muller that his May 7 letter provided the basis for negotiation, but all further discussions were deferred because of a security offering by SCM and a consequent "quiet period." However, on August 4 discussions were resumed at a luncheon at the Atrium Club attended by Rodich, Egli, Muller and Brier, the latter being a participant in MacMuller Industries, as well as officers of Citibank where Muller and his companies banked. One of the purposes of the meeting was to discuss Muller's financial standing. Wallace of Citibank stated his satisfaction with the bank's relationship with Muller and added that he dealt only with seven figure accounts. No further representations were made or requested. Muller at the time was seeking financing from Citibank, financing which he failed to obtain. Shortly thereafter SCM obtained a Bishop's Service and a Dun & Bradstreet report relating to Muller. Muller's strengths were described in the Bishop's Service report by one source as "putting together financial deals, acquisitions and raising money." No further questions were raised concerning Muller's finances during this phase of the discussions.

*The Agreement in Principle*

Shortly after the Atrium meeting Rodich gave Muller a list of items which he considered to be essential to SCM in connection with the contemplated transaction. At a later meeting in September this list was supplemented by four additional items. These memoranda are annexed as an Appendix to this decision. These points were viewed as "the Bible" by Rodich according to Muller and were non-negotiable. Whether or not the term was in fact used, these documents constituted the basic agreement which remained in place throughout the discussions, including the formula by which the purchase price was to be calculated. Muller accepted these items, the firm of Hardee, Barovick, Konecky & Braun ("Hardee Barovick") was retained by Muller, meetings were held and at one point in August it was even suggested that consideration be given to a closing at the end of the month, an objective which continued to elude the parties.

In mid-September, principally as a consequence of Rodich's memoranda it had been agreed by Rodich and Muller that Muller would purchase the non-typewriter European business of SCM, that the purchase price would be calculated on the basis of a formula derived from Muller's offer of $9.0 million cash for $16.4 million assets as of August 31, 1976, that the typewriter assets would be stripped out by SCM prior to closing, that the business would be operated by SCM for Muller in its ordinary course after August 31, 1976 and that the purchase price would be adjusted to reflect events subsequent to that date. The transfer would be in a form determined by SCM, which initially called for the intended transfer of the stock of the French, German, Belgian and Swiss subsidiaries, and the transfer of the copier assets of the U.K. and Chur subsidiaries. SCM retained its claims against Xerox Corporation for damages in a pending litigation involving, among other things, claims that Xerox unfairly competed with the SCM copier subsidiaries. Muller assumed responsibility for possible employee severance and vacation pay obligations, leases and employees in the U.K. relating to the copier business, and the performance of SCM purchase agreements for equipment and supplies. Muller had the right to license and use the SCM name and logo for three years with appropriate safeguards on its use. SCM made certain warranties with respect to undisclosed liabilities, inventories

and accounts receivable. Discussions on these matters correlated the "deep discount" from stated asset value with the assumption by Muller of the employee severance liability and lease obligations of SCM.

The burden of preparation of more formal documents fell upon Arthur J. Mannion, Jr. ("Mannion"), inside counsel for SCM, his work product then to be reviewed by the Hardee Barovick firm. The latter firm also employed Harvey Dale as outside tax consultant. A closing at the end of September was then anticipated. Both sides dispatched teams of lawyers and accountants to Europe, the latter to conduct "a businessman's review" and the former to obtain facts and delineate issues to be incorporated in the agreements to be signed. The parties resumed discussions in New York in the latter part of September dealing in part with issues resulting from the trip, including the effect of a French transfer tax and the anticipated time to obtain a necessary Bank of England approval.

In connection with its 10–K report for the fiscal year ending June 30, and other matters, Elicker met with the SCM board and after discussion the following resolution was adopted:

> We have agreed in principle to sell our European office copier operations to N. Norman Muller, a private investor who owns substantial interests in various businesses. Current personnel and management will continue to operate the sold business.

SCM's 10–K filed with the SEC on September 30, 1976, stated in relevant part:

> In late September, 1976, the Company reached an agreement in principle to sell its European copier sales and service operations. These operations account for approximately 40 percent of SCM's copier products net sales, with an operating income of approximately $2 million in fiscal 1976 which was expected to decline in fiscal 1977. The Company makes no assurance that this transaction will be completed.

During the same period Muller was anxious to make his presence felt in Europe and to establish a relationship with the general managers of the subsidiaries. A trade exhibition in Paris in late September 1976, the SICOB show, provided an opportunity to satisfy Muller's needs. That, together with SCM's reporting requirements, resulted in a press release which was issued on September 28, 1976, and which stated with respect to the transaction:

> SCM Corporation has reached an agreement in principle to sell its office copier service organizations in the United Kingdom, France, Germany, Switzerland and Belgium and its distribution operations covering Europe, the Middle East and Africa to a company controlled by N. Norman Muller, a private investor.

> While terms of the agreement in principle were not disclosed, Paul H. Elicker, president of SCM, indicated that SCM would incur a pre-tax loss of approximately $1.4 million on the transaction.

> . . . . .

> The proposed sale of the European copier business is subject to a definitive agreement expected to be reached soon. SCM said that all parts of the combined 900-man marketing operation would be sold to the new owners intact and the current management will continue to operate the business . . . .

The announcement was reported in The New York Times, The Wall Street Journal, on the Dow Jones ticker tape and elsewhere. These events aroused sufficient interest in Muller to result in an article in *Forbes* which reported that Muller intended to use his own assets to buy the subsidiaries, a report that was more fictional than factual, given Muller's discussion with Citibank and his later discussions with the Chemical Bank to be considered below.

The "agreement in principle" thus approved by the SCM Board and announced to the public at large consisted largely of the thirteen items set forth in Rodich's August and September memoranda, to· which Muller had agreed. These points with some

additions and alterations remained central to the negotiations throughout.[1]

After the issuance of the September 28 press release, the principals left for Paris where the SICOB show was in progress. Rodich addressed a luncheon meeting of the general managers of the subsidiaries at the Hotel Crillon, sought their cooperation during the period before the contemplated transfer could take place, offered a substantial bonus in the event that the transaction was completed as contemplated, and introduced Muller as the intended buyer. He then left the meeting and returned to New York. Muller remained and discussed the business of the subsidiaries with the general managers, and attended the SICOB show and a reception given at the Hotel Intercontinental for the general managers and suppliers to the subsidiaries. These events ended up as charges to Muller's bill at the Crillon, as did the charges for the living expenses of Muller's party, all of which were subsequently paid for by the French subsidiary. SCM seeks repayment of approximately $14,000 by way of counterclaims, more to establish some of the color surrounding these events than to be made whole financially, and of course Muller is responsible for any expenses not related to his business activities. The evidence presented, however, has been inconclusive as to the amount properly attributable to Muller's personal expense.

1. Plaintiffs' version of the Agreement in Principle accords with the evidence. The thirteen points are integrated and summarized as follows:

(1) SCM was to sell and transfer all the six copier subsidiaries, except for business operations relating to typewriters.

(2) The typewriter assets were not to be transferred, but were to be retained by SCM.

(3) SCM was to retain all cash and cash equivalents of the copier business as of August 31.

(4) The transfer would be in a form determined by SCM; SCM determined, based on its tax interests, to transfer the stock of the French, German, Belgium and Swiss subsidiaries, and to transfer the copier assets of the U.K. and Chur subsidiaries.

(5) The purchaser would be a company to be formed by Mr. Muller.

(6) The purchase price was to be the dollar equivalent of 53.4% of the book value of the copier assets of the companies as of August 31, 1976, to be calculated after asset values were determined as of this date.

(a) As noted above plaintiffs assumed the balance sheet liabilities towards payment of the purchase price and, if any balance remained, this was to be paid in cash.

(b) SCM would have the right to allocate the total purchase price among the six subsidiaries and assign values to each of the four stock sales and two asset sales.

(7) SCM would retain claims it had against Xerox Corporation for damages in a pending litigation involving, among other things, claims that Xerox unfairly competed with the SCM copier subsidiaries.

(8) The purchaser would assume responsibility for:

(a) possible employee severance and also vacation pay obligations;

(b) in the U.K., leases relating to the copier business and employees relating to the copier business; and

(c) performance under purchase agreements of SCM for equipment and supplies.

(9) Plaintiffs would have the right to license and use the SCM name and logo for three years with appropriate safeguards on its use.

(10) As to possible undisclosed liabilities, shortages of inventory, and uncollectible receivables, SCM undertook as follows:

(a) It warranted against undisclosed liabilities for all claims over $10,000, and, if they were under $10,000 per claim, to the extent such claims in total exceeded $150,000.

(b) It would be responsible for shortages of inventory count to the extent they in total exceeded the inventory reserve.

(c) SCM would be responsible for uncollectible receivables to the extent they in total exceeded the receivable reserve plus $200,000 (but in no event less than $500,000) and to the extent of 53% for each dollar thus in excess.

The additional agreed-upon terms relating to transfer of the subsidiaries are accurately summarized by the plaintiffs as follows:

(1) The operations of the subsidiaries and any profit or loss after August 31, 1976 in the operations of the businesses would be for the plaintiffs' account and benefit.

(2) The businesses being sold would be operated "in the ordinary course of business" from August 31, 1976 until the closing, preserving, among other things, the companies' goodwill with general managers, suppliers and customers.

(3) The businesses would be transferred "intact" and as an "ongoing operation" and as part of this, all New York management personnel and all general managers would be transferred.

(4) Mr. DeMaio would be in charge of operations until closing.

*The Drafting Period*

After returning to New York a first draft of an agreement on the sale of one of the subsidiaries was prepared by Mannion. It was considered to be incomplete by the Hardee Barovick firm; some words were had on the subject, and by early November SCM retained Messrs. Sullivan & Cromwell to assist in the negotiations and preparation of agreements.

On November 8, 1976, SCM's Board of Directors adopted the following resolution:

RESOLVED, that the officers of the Company be and hereby are authorized to negotiate the sale of the Business Equipment Division copier operations in England, France, Germany, Belgium (including distributor operations) and Switzerland to N. Norman Muller or a company(ies) owned by N. Norman Muller at such prices and pursuant to such other terms and conditions, as in its absolute discretion, may be approved by the Executive Committee of the Board of Directors....

It is undisputed that both parties anticipated that a final written agreement would be reached and executed, an anticipation that, of course, was never fulfilled although a closing date of March 31, 1977 was acceptable to Rodich and was subsequently advanced at SCM's request as more fully set forth below. Meetings were held between counsel on November 16, 17, 18 and December 10 and with the participation of the respective clients on December 15 and 16. Drafts were discussed and negotiated. The starting points for these discussions were the thirteen points outlined by Rodich in August and September and accepted by Muller before the SICOB trip. The negotiations produced a number of refinements and changes.

The non-copier assets of the French, German, Swiss and Belgian subsidiaries, the shares of which were to be acquired by Muller, were not to be stripped out prior to closing but rather to be transferred to third parties, affiliates of SCM, for cash. Since the transaction contemplated a purchase price based on the formula described above, this change increased the cash in the subsidiaries at the time of closing and thus increased the cash required to close.

Throughout it was understood that SCM was concerned about its employee severance liability and its good will. Clauses were drafted to prevent dividends, loans and pledges which would transfer funds from the Muller operating companies to Muller or his holding companies.[2] These clauses were designed to prevent Muller from removing assets from the subsidiaries but did not by their terms prevent any other transfer pledges or loans to third parties.

SCM sought to obtain a personal guarantee from Muller and a commitment to operate the subsidiaries for three years. The request was refused, and no provision appeared in the last drafts on this subject. SCM sought a provision requiring approval by its Board of Directors before signing, a request which was rejected in view of the action already taken and upon the view of SCM's counsel that the signature would not be affixed unless the agreement was approved.

At the negotiations at the Atrium Club in August, SCM had sought reassurance as to Muller's financial competence. The Dun & Bradstreet and Bishop's reports had been reviewed. During the negotiations in the fall SCM sought Muller's personal guarantee and certified financials but these requests were rejected by Muller. The issue was resolved by the limitation on upstream pledges, loans and dividends, the purpose of which was to prevent the transfer of funds to Muller which might jeopardize the viability of the subsidiaries.

During this period from September through December it was understood by all concerned that the companies which were to be the subject of the agreement were being operated by SCM for the benefit of

2. These clauses in the last drafts permitted upstream transfers "so long as the funds came to rest within the pool." In other words, for tax or accounting purposes the funds could be transferred simultaneously as long as they remained available for use in the pool.

Muller. So-called "Flash Reports," weekly forms reporting the pertinent financial data, were shared with Muller. Rodich had instructed DeMaio to keep Muller apprised of all developments. No significant problems were raised or discussed between the parties during the period concerning the operation of the business in the normal course. However, one significant development, relating to the production and marketing of a plain paper copier, began to cast a shadow over the business picture.

DeMaio, after being instructed in the fall of 1975 that SCM intended to cast his division adrift, loyally assisted in the plans to locate a willing buyer to whom the business could be transferred. However, he was persuaded that the viability of the business even to its new owners required the capacity to compete in the plain paper copier field whether or not SCM had determined to abandon this field. To this end he had obtained Rodich's agreement to travel to Japan in the spring of 1976 to select a manufacturer of a plain paper copier and arrange for its production as recounted above. By early fall he had exchanged correspondence with Mita relating to the production of a plain paper copier, its testing and the purchase of a number of copiers. Muller shared DeMaio's belief that the availability of a plain paper copier was essential to the health of the European subsidiaries. The SICOB show was the public debut of the Mita plain paper copier, and the European managers were encouraged and enthusiastic, shared DeMaio's hope for the success of this product and the consequent commissions on sales, a factor which served to hold the sales organizations together during this period of uncertainty. Orders for sales were taken for production to commence some time around the first of the year, and these orders appeared on the Flash Reports.[3]

It was anticipated that the Mita copier would cost in the neighborhood of $3,000 and be sold for approximately $4,000 and that approximately 2,000 units would be involved in the first year's production. Thus an initial investment of $6 million was in contemplation. Since SCM in its 1976–77 budget had determined to reduce its commitment to the copier business and to liquidate its investment, and since Muller felt that plain paper copiers essential to his ability to carry on the business, the production of the plain paper copier had the potential of presenting a significant divergence in business objective between Muller and SCM. However, only the tip of this issue could be perceived on the horizon in mid-December, and neither of the parties focused upon it. By all that had been discussed between the parties and their counsel, the operation of the business was proceeding to the satisfaction of each.

*The Agreement and Final Events of 1976*

By mid-December counsel had produced 16 drafts, and pressures were building up for a resolution. Rodich was to be reassigned as of January 1, 1977 to become President of the Chemical and Metallurgical Division of SCM headquartered in Baltimore, and as the principal negotiator for SCM he sought to conclude the discussions. He called a meeting at SCM for December 15 to be attended by all counsel and their clients with the purpose of clearing up all matters then outstanding.

Rodich, Muller, and DeMaio, Robert Kay, and Ronald Konecky, counsel for the buyer, John Merow and Charles Sprague, counsel for the seller, James Conway, the chief auditor of SCM and Ben Evans, the S. D. Leidesdorf partner bearing accounting responsibility for Muller, and two other lawyers all testified as to the conduct of this meeting. Two drafts were discussed, one a "Global" Agreement between buyer and seller and the second, the agreement for the sale of the French company which was intended not only to serve to govern that transfer but also to serve as a prototype of the agreements to be completed with respect to the Belgian, Swiss and German

---

**3.** The orders for the plain paper copiers from late September through January, as indicated by the Flash Reports, were approximately 450.

companies. It is undisputed that the drafts were reviewed, page by page, and all open issues were sought to be resolved. Parties caucused in various groups, discussions were held, and agreement was reached wherever possible. It was contemplated that another draft would be generated by Sullivan & Cromwell, and indeed on the evening of December 15 another draft of the Global Agreement was produced.

The meeting continued on December 16, and at its conclusion the assembled group was asked by Rodich whether there were any open terms, and none were advanced. Sullivan & Cromwell was to provide agreements embodying the discussions. The negotiators were released, and adieus, season's greetings and congratulations were exchanged. Rodich escorted Muller to DeMaio's office, and advised the latter that the meetings had been successfully completed. Whether or not Rodich stated, as recalled by Muller and DeMaio, "Frank, shake hands with your new boss, the deal is done," the import of the meeting with DeMaio was to acknowledge in an informal manner the transfer of power. In addition Rodich took Muller to Egli's office and advised Muller that Egli would finish up the transaction. He also informed the finder that his fee could be expected around Christmas or shortly thereafter.

On December 16, the Board of SCM met and the following minute was made with respect to Elicker's report:

> He commented on the sale of the European copier business and the assignment of domestic copiers to Allied Paper.

By deposition Elicker expanded on this subject, stating that he had informed the Board that he remained hopeful, that the negotiations were "stuck," that Rodich's transfer would be completed and that Egli would take over for the short and temporary period remaining.

Elicker also testified by deposition that a receivable for the Muller transaction had been booked by the Board in 1976. Both Egli and Conway disputed this fact, and testified that no such entry appears on the SCM books. Egli also indicated that Elicker must have confused the September write-down of the copier assets when he testified about this receivable. Given the clarity of Elicker's pretrial deposition, his absence at trial, the testimony of Conway that such an entry would not have been made for about ten days after year-end, and the findings shortly to be described concerning Egli's year-end memo, the preponderance of the evidence weighs on the side of the existence of the booking.

Just after the meeting, on behalf of Muller the following request was made to the French government for approval of the transaction:

> [SCM] has come to an agreement with Mr. Norman Muller, a U.S. citizen, under which the Group of the latter will take over the SCM copier business in some of the European countries, i. e., West Germany, Belgium, the United Kingdom, Switzerland, and France.

As the negotiations were being held DeMaio telexed to Mita seeking to complete the plain paper copier transaction and confirming a Letter of Intent between Reprosystem and Mita for the purchase of about $6,000,000 worth of plain paper copiers from Mita. On December 16 DeMaio also notified Mita that

> we have agreed, on December 15, 1976, to the final terms and conditions pertaining to the sale of the six European companies and the distribution right in all other countries in all of Europe, the Middle East and Africa.

While the negotiations were in progress, DeMaio had prepared a telex for the managers keeping them advised of the events. Rodich approved the telex and it was transmitted on December 17. It read:

> This is a brief report on the status of our negotiations to sell the Europe, Middle East and African copier group to N. Norman Muller.

> I am sure you appreciate that the complexity of the transaction has made negotiations and workload much more extensive than anyone anticipated. However, we now feel that the problems are resolved and that the deal is made subject

to approval by various government agencies.

Before year end the DeMaio letter to Mita was reviewed by Rodich and the SCM inside counsel. They perceived the danger of a long term commitment, as did Muller who on December 20 rejected any responsibility prior to taking title. SCM urges that this refusal by Muller evidences the lack of an agreement. A more rational inference is that Muller merely sought to defer his obligations until the expected closing. On December 28 Rodich wrote to Mita as follows:

I have had an opportunity to review Mr. F. D. DeMaio's letter of December 16, 1976, with which he transmitted a 'Letter of Intent' in the name of Reprosystems, B.V. for the purchase of Copystar Model 251R.

As you are aware, SCM is in the process of selling its European based office copier business to Reprosystems, B.V. We have every reason to believe that this sale will be consummated; however, it is not possible to accurately state when the transaction will be completed.

We want to be sure that you understand that Mr. DeMaio's communication was on behalf of Reprosystems, B.V. and not SCM Corporation and that performance under the 'Letter of Intent' is a legal and financial responsibility of Reprosystems B.V.

Reprosystems will be licensed by SCM to use its trademarks on copier products sold through the organizations which they will be acquiring. We understand that Reprosystems, B.V. intends to strengthen and expand its copier business, and we hope that Mita and Reprosystem will have a long and mutually profitable relationship.

After the negotiations of December 15 and 16 Egli again sought reassurance with respect to Muller's financial capacity and requested a financial statement which he said would be reviewed only by Rodich and Elicker and be held in confidence. This statement, supplied by Muller on December 20, 1976, showed a net worth of $6,179,000. History and the vigor of SCM's counsel has revealed that these assets were overstated, including as they did certain assets of Muller's wife and some evaluations of control stock that could have been the subject of varying opinions. In fact, on the same day, in connection with anticipated bank financing, Muller submitted more conservative figures to the Chemical Bank, which presumably had previously acquired data on Muller's assets. Muller set forth a net worth of $3,617,000 to the bank. However, in December, 1976 SCM chose not to pursue any further inquiry into Muller's finances.

On December 27 Sullivan & Cromwell provided what in the lexicon of this litigation have been termed the Final Drafts of the Global Agreement, and the French, Belgian, German and Swiss Purchase Agreements. On January 5 these were supplemented by the Final Drafts of the United Kingdom and Chur Asset Purchase Agreements. These Final Drafts, accomplished in the manner described, constituted written agreements between the parties on all material terms relating to the proposed sale, and it was so understood by all those involved as of the morning of December 31, 1976. It was also expected and understood that these Final Drafts might be subject to some minor changes and that they would be executed in the near future. The Global Agreement contained standard language to the effect that it as well as each of the Purchase Agreements would become binding only upon execution.

Counsel's notes indicate certain reservations of Muller's counsel concerning the non-competition, dividend limitation, severance liability, and SCM indemnity clauses in the Final Drafts, but no testimony was adduced to establish that these represented serious, deal-breaking issues for Muller. Indeed the most serious of these issues from SCM's professed point of view, the employee severance liability, engendered simply a query. The other clauses had been previously discussed and resolved so that renegotiation was not likely, despite the mark-ups made by Palley, one of Muller's counsel. In view of Muller's testimony concerning his own understanding of the transaction after

the meeting of December 15 and 16 and Palley's testimony, the latter's notes represent no more than a careful lawyer's review in preparation for a further discussion with either his client or the other side, neither of which took place. Although some uncertainty existed with respect to the tax results of the French transaction and the time by which the necessary Bank of England approval could be obtained, these uncertainties were to be resolved by third parties and the preponderance of the evidence does not establish that these uncertainties were sufficient to negate the understandings set forth in the Final Drafts.

*The Disagreement and Events in 1977*

In accordance with his practice of reviewing financial matters at the end of each quarter and in order to familiarize himself with the transaction, Egli took home on New Year's Eve certain of the documents relating to the proposed sale to Muller. He reviewed the transaction and then made notes of his findings. These notes became the basis of his recommendation to Elicker on January 3. The handwritten notes were introduced, and the alternatives as viewed by Egli were described as follows:

Present Alternatives

1) Resolve open [Muller deal] issues & get contract signed (good for Muller not good for SCM).

2) Slow down on signing contract & send team to Europe to study other approaches to liquidating our investment.

3) Ask for cash payment put into escrow.

4) Kill deal and:

 a) Try to spend $2.0–$2.5 [million] on liquidation before 6/30/77 to reduce taxes.

 b) Develop a specific plan for each disposition separately.

These alternatives and the financial implications were discussed with Elicker and Hall, Senior Vice President-Administration of SCM on January 4, 1977. Although there is no report of the substance of any internal SCM discussions concerning the finances of the copier business, by year-end it

was apparent to Egli that net income for the first half of the fiscal year would be in the neighborhood of $500,000, almost the prior estimate of $600,000 in profits for the entire year. By the projected closing date Egli estimated profits of over $1.2 million. Given the cash implications of the transaction, to be discussed below, it is inferred that these calculations resulted in Egli's conclusion that the deal was "good for Muller, not so good for SCM." Egli testified that at the January 4 meeting, it was determined that SCM would proceed with the deal, attempting to resolve all open issues. In that connection Egli presented at the meeting the following items, first noted in his December 31 memo:

1. Accrued vacation and holiday pay.
2. Interest on purchase price from 8/31.
3. 8/31 audit adjustments and calculation of purchase price.
4. Muller's ability or willingness to finance as necessary.
5. Timing of close—now after 3/31/77.
6. PPC's. [plain paper copiers]
7. Which [general managers] are going with Muller . . . .
8. Gov't approvals.

Only one of these issues—interest on the purchase price—had not been the subject of previous discussion, and none represented material issues beyond resolution except perhaps whatever was indicated by the item "PPC's," but in any case this item was not amplified or explained on January 5 when Egli met with Muller and his counsel Kay.

Prior to that meeting and subsequent to his meeting with Elicker, Egli met with counsel from Sullivan & Cromwell, and all open items were discussed. No testimony has been adduced that there was discussion at that meeting to the effect that the deal should be killed, and indeed there is no direct testimony from any SCM witness that the formal termination of negotiations which occurred later on February 2, 1977 resulted because of an intention of SCM to defeat the transaction.

From January 4 to February 2, 1977 events moved rapidly and quite inexorably.

Despite Muller's belief that Egli's function was simply to conclude the arrangements, Egli at the January 5 meeting placed unresolved issues on the table adding four additional items to those he had noted over the weekend. Kay, having returned from the holidays, did not rejoin but merely recorded the positions taken by Egli. In the course of this meeting Egli stated his intention to visit the subsidiaries, a trip to which Muller objected, stating that it made more sense to accelerate the paperwork and complete the transaction. Egli insisted on the trip, the purpose of which was not satisfactorily explained by Egli at that time or at trial. DeMaio objected to the trip, carried his objections to Elicker and was overruled. DeMaio heard immediately after the trip from the managers of the subsidiaries who told him that Egli had indicated serious doubts about the completion of the transaction.

On January 11, William Cawley, Vice President and Treasurer of SCM, wrote to Muller and suggested that the SCM policy relating to equipment held for lease had not been complied with and that certain action would be taken. The letter further stated:

> As you know, the contract requires SCM to carry on the business of the European companies in the ordinary course during the period between September 1 and closing. Our lawyers tell us that since those instructions may be construed to be not in the ordinary course that we should request your consent.

In fact, the evidence at trial established that Rodich had authorized the "additional investments" which were the subject of the letter.[4] The letter is significant since Cawley testified by deposition that it was written at Egli's request and during his European trip. The inference is thus drawn that after consultation with counsel, Egli viewed the Final Drafts as a contract and had embarked upon a change of direction for the European subsidiaries.

Egli then for the first time sought evidence of Muller's capacity to pay the cash required at closing, discussing the transaction with officers of the Chemical Bank. The bank provided Muller with an informal non-binding commitment letter dated January 20, 1977 which was turned over to SCM. Although SCM also used the resources of the Chemical Bank and although Conway of SCM had been in touch with the bank on the subject of Muller's financing, no further inquiries were made. In fact, unbeknownst to SCM, Muller had obtained the letter from Chemical on the understanding that the cash in the subsidiaries to be acquired would immediately be used to pay the purchase price advanced by the bank, an understanding which gave rise to serious questions raised by SCM after the litigation had commenced and which are dealt with below. Although the closing date had been fixed at March 31, Egli insisted, without objection by Muller, on its advance to February 28.

The purchase price and the attendant cash required to close had been the subject of calculations by the accountants on more than one occasion. Both Evans, representing Muller, and Conway of SCM were in agreement on the values as of August 31, 1976, and the formula to obtain adjustments to make these numbers current as of the closing date. Indeed the variation between the calculations as of the end of August and those at the end of November and December was relatively insignificant, the cash required to close hovering around $4.25 million. However, this figure took a significant jump in January. This increase resulted from a recalculation of certain Swiss accounts receivable prior to August 31, and most significantly from the demand for interest on the purchase price, approximately $145,000, and the request for $540,000 which resulted from an inter-company transfer. This transfer involved a loan from the German subsidiary to a Canadian

---

4. Cawley's request was for a waiver of the regular course of business representation as affected by a repetition of the freeze on acquiring new equipment which had been in effect throughout fiscal 1976–77. The freeze, part of SCM's investment plan, had been modified in operation by an understanding reached between DeMaio and Rodich that new equipment for lease would be acquired if necessary to satisfy old and important customers.

SCM subsidiary, and the treatment of the exchange rates had significant tax effects. The work papers relating to this transaction were never turned over to Muller's accountants nor was the entry satisfactorily explained—either at the time to Muller's representatives nor during the trial to the court. However, whatever ultimately might have been the accounting effect of this transaction, Muller agreed to accept the adjustment as presented. There was, however, no agreement on the demand for interest on the purchase price, and no evidence to counter the implication that this was an afterthought intended at the least to offset the profits earned by the subsidiaries.

Throughout the negotiations SCM had undertaken not to compete in the copier field, and indeed its stated purpose had been to withdraw from such competition. In January this stance was altered, SCM seeking to retain the ability to compete in the event that it acquired any copier rights from Xerox as a result of pending litigation.

However, the most significant actions taken by Egli related to operation in the normal course of business. Egli took steps to reduce the leasing of new equipment, presumably to increase cash sales. On January 11, as recounted above, SCM in effect withdrew the representation that the business had been conducted in the normal course. In addition Egli told Muller he intended to go to Europe to discuss the plain paper copier situation with Mita. Muller asked to accompany Egli who refused the request.

The plain paper copier issue had been precipitated by a request by Mita for a letter of credit to cover merchandise to be shipped. SCM, on the horns of a dilemma of its own making, sought to keep the relationship intact and at the same time to minimize capital commitment. On the second trip to Europe in January, Egli negotiated an understanding with Mita that relieved SCM of any substantial ongoing relationship but permitted the subsidiaries to meet their sales commitments. The substance of this negotiation was undertaken under a pledge of secrecy and substantially affected the business, as Egli knew it would.

Upon his return from Europe Egli met with Elicker, Rodich was called back to New York, and it was determined to fire DeMaio and the other New York administrators of the subsidiaries and their secretaries without discussion with Muller or any prior notice to him, although continuity of management had long been understood to be a consideration for Muller. Egli told DeMaio he was fired and directed that he be escorted out of the building. The firing of DeMaio previously a well-regarded executive of 11 years' standing,[5] resulted from the bottom line analysis by Egli of the financial results of the transaction and DeMaio's commitment to the continuation of the business on behalf of Muller, a course upon which DeMaio had earlier been set by Rodich in spite of the situation of inherent conflict that this created.

Egli explained the firing as a result of the Mita misunderstanding, a failure to implement the freeze on the leasing of new equipment, and an unconfirmed report that a controller in one of the subsidiaries sought to decrease the cash in the subsidiaries as of August 31, for Muller's benefit and at DeMaio's direction. In fact the freeze policy had been modified by Rodich unbeknownst to Egli, the reported event relating to the August 31 reports did not occur, and the report itself was neither investigated or confirmed. DeMaio's participation in the Mita transactions was known shortly after its occurrence and was faithful to the business-in-the-ordinary-course precept. The reasons given for the firing of DeMaio were pretextual, and therefore constitute significant evidence that Egli indeed sought to kill the deal.

---

5. DeMaio testified that though he had not discussed the Muller transaction in detail with Elicker, he had met his chief executive in the hall in December, 1976. Elicker thanked DeMaio for his efforts on the transaction, wished him well in his future endeavors in the same role under Muller's ownership and told him that he well deserved the reward.

By January 20, SCM issued a press release stating that it felt free to pursue "other alternatives" to a sale to Muller, who at the moment of being informed of this change of position was attendant upon an ill wife. He asked Conway to modify the language to soften its implication, a request which was refused.

On January 31 Muller wrote to Elicker seeking to enforce the agreement and on February 2 SCM formally terminated the negotiations. At no time did Egli carefully review or discuss the Final Drafts internally; at no time were any of the Final Drafts signed by any of the parties, nor did Muller ever tender the purchase price. In view of what was done as opposed to what may have been said at the meetings held on January 5, 6, 14 and 17, and on February 2, I find that SCM's financial interest required that the sale not go forward, that Egli realized that fact, that the actions taken in January, 1977 by Egli on behalf of SCM had the effect of slowing down the signing and killing the deal, and that a specific plan for disposition of each corporation was evolved, contrary to the Agreement in Principle and the Final Drafts. In other words, the acts performed require the inference that in January the responsible officers of SCM reached a conclusion to terminate the transaction with Muller.

*The Ability to Perform the Agreement*

Throughout the trial, if not during the negotiations, SCM insisted that Muller lacked the capacity to perform the transaction, and factual findings on this issue are required. At the outset it was understood that SCM was concerned about two significant items, its potential employee severance liability of approximately $6 million and its continuing bank guarantees. After Muller's refusal to give an undertaking to continue in business for three years and a personal guarantee, SCM sought security

for the transferred companies through the restrictive provisions on pledges, loans and dividends described above, recognizing that the form of the transactions and the continuation of the companies in business with adequate funding were significant to its concerns.

As to the liability on bank guarantees, early on Muller undertook to have SCM removed from the guarantees. The pro forma financials submitted to the Chemical Bank in January in order to elicit its informal letter of commitment revealed short term loans of $2,363,000 as of November 30, 1976 as a liability of the new companies.[6]

Throughout the negotiations the requirement to produce a certified check at closing was the only provision relating to Muller's ability to close the transaction, other than the somewhat informal required financial representations already referred to. As evidenced by Muller's submissions to the Chemical Bank on January 7 it was his intention, at least at that point, to provide the cash required to close by a bridge loan, to be repaid out of the cash on hand in the acquired companies. In view of the facts now found, it is not necessary to determine the exact amount of cash required to close. If the transaction had gone forward on the basis of the Final Drafts, that amount would have been in the neighborhood of $4.5 million. Had all SCM's proposed accounting charges been accepted that amount would have been increased by approximately $1 million.

A substantial amount of testimony was adduced by both sides on the subject of Muller's capacity to perform the agreements represented by the Final Drafts. This included the refusal of Citibank in the early fall to provide financing and a similar refusal by the Chemical Bank International Division, though these refusals are by no means conclusive evidence on Muller's abili-

---

6. Egli on many occasions during the trial stressed his concern about SCM's liability on these guarantees. However, the guarantees were not the subject of identified documents, nor had they been tabulated and presented to Muller. No objective reason was advanced to indicate that any difficulty would be encoun- tered in getting SCM off the guarantees other than the observation that SCM was a substantial corporation, and Reprosystem was not. Egli testified that Muller did nothing to accomplish the agreed upon substitution. Neither did SCM, which according to Egli would have had a far greater interest in the matter.

ty to finance the transaction. Citibank was dealing with different facts than those which were present in December, and Chemical had internal reasons for refusal. Nonetheless, these refusals do establish that financing for a $5 million transaction cannot be assumed.

It was agreed by certain witnesses for each side that some mention was made by Muller's representatives that they might seek to use the cash in the German company in connection with financing the purchase price. Muller and his representatives, Kay and Evans, all testified that it was understood by both sides that the cash on hand in the acquired companies could be used to finance the purchase price, and it is certain that some discussion along these lines, at least with respect to the German company, did take place. A review of the documentary evidence also establishes a preponderance of evidence that the issue was discussed, particularly in connection with the restrictive provisions which occupied a considerable amount of time in negotiation and drafting. The notes and recollection of Kay, Muller's counsel, are supported by a parallel reference in the notes of SCM's outside counsel relating to the same provision at the same meeting. In the vocabulary of the parties the entry "Purchase price may leave the pool" establishes the fact that the cash in the subsidiaries was considered with respect to Muller's financing, despite the inability of counsel for SCM to recall the significance of the phrase.

However, even though I find that this method of financing the purchase price was discussed between the parties, the discussion is relatively unimportant. SCM at no time sought to inhibit any such financing. The testimony concerning the commonality of such a practice is undisputed, and SCM could hardly be characterized as an ill-advised seller. There was no prohibition in the Final Drafts or in the discussions of the parties barring Muller from using the cash

in the subsidiaries to assist in the financing of the purchase price.[7]

Of course, in the light of the facts so far found, it is obvious that Muller's ability to perform the contract he alleges cannot be established by anything that actually occurred, but rather by an assessment of what in all probability would have occurred. It is undisputed that Muller did not tender a certified check in the amount of the cash required at closing as it was calculated as of December 31, 1976 or for any other amount which might have been determined. Indeed, outside of the projected financing, no direct evidence was presented to establish that a source was available to provide the $4 million plus which would have been required. Muller's informal bank commitment letter from Chemical was just that. No commitment fee had been paid, and Chemical was not bound to produce the financing. Further, the projected financing depended on cash remaining in the companies to be sold.

Both Rodich and Muller testified that Muller had agreed to eliminate SCM's liability on the bank guarantees and that such a result could be achieved either by paying the loans or relieving SCM of its liability. It would not have violated the understanding between the parties for SCM to have required the subsidiaries to pay off the short term loans and overdrafts prior to closing, or to require Reprosystem to do so immediately after closing should the banks be unwilling to release SCM from its guarantees. SCM has successfully demonstrated that such an event would have stripped the subsidiaries of cash. Under such circumstances the contingent nature of the Chemical's informal commitment does not rise to the level of proof that Reprosystem would have been able to perform the contract and provide the necessary cash at closing. That Muller had assets, there is no doubt, but no direct evidence was presented as to the amount of cash which could have been generated by the use of these assets. Similar-

7. Although such a gloss might be sought to be imposed upon the restrictive provisions, the language of the provisions reads otherwise.

ly, though the subsidiaries undoubtedly had value, no direct evidence was presented that any particular financial sources would have provided the bridge financing necessary. The commercial reality of Muller's ability to close the transaction was not established by a preponderance of the evidence.

## CONCLUSIONS OF LAW

The facts as found above do not lead to simple conclusions of law, to be recited as first principles, known and recognized from the beginning of recorded legal history. What has been described is the complicated interaction which takes place when major corporations dispose and acquire substantial assets. Such transactions require lines to be drawn, projected from earlier established principles which then define duties and obligations perhaps not previously perceived or articulated as such.

In this instance the parties in December, 1976, agreed upon all material terms of a contract which was to be embodied in a final agreement to be executed. An agreement was reached, and that agreement required the good faith action of both parties to complete the transaction. SCM's acts from December 31 are inconsistent with its duty to perform its agreement to act in good faith. SCM has been unjustly enriched with profits earned on Muller's account, and must disgorge those profits as the most readily available approximation of the relief to which Muller is entitled in damages and restitution. On the other hand, given the failure of Muller to establish that Reprosystem was ready, willing and able to perform the bargain, Muller is not entitled to damages based on any profit which he might achieve had the end-transaction been performed, or full expectation damages measured in any other way.

SCM's acts, described above, while in violation of its obligations to Reprosystem, were motivated not by an intent to defraud or deceive but simply out of a careful financial analysis, not rising to the level of fraud under the securities laws or common law. It seems almost implicit that the federal claim, though facially sufficient, served principally to establish initial jurisdiction, which was accomplished without objection or motion. The claim, however, is insufficient both as a matter of law and fact.

*The Securities Claim*

■ If the strict language of Section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, were to be applied automatically because a sale of securities was contemplated, then virtually every sale of a business structured as was this transaction would call into play the panoply of rights and remedies under the securities law. An examination of the essential purpose of such laws is required whenever this outreach is sought.

The subject matter of this lawsuit is the purchase and sale of a business, even though that purchase and sale in part involved a transfer of ownership evidenced by stock. Recently, the Seventh Circuit Court of Appeals confronted the question of "whether alleged fraud regarding the sale of assets and stock in a corporation falls within the scope of [the federal securities] laws." In *Frederiksen v. Poloway*, 637 F.2d 1147, (7th Cir. 1981), *cert. denied,* —— U.S. ——, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981), it was held that the acquisition of a marina did not involve a "security" within the purview of the federal securities law. The court, at 637 F.2d 1150, quoted the following observation of the Supreme Court in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975):

> The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors.

The *Frederiksen* court noted further the conclusion of the Court in *Forman* that the securities laws do not apply when the goal

of a purchaser is not investment, but a desire to "use or consume the item purchased." 637 F.2d at 1150, *quoting* 421 U.S. at 852–53, 95 S.Ct. at 2060–61.

The 1934 Act provides that "[t]he term security means any ... stock," 15 U.S.C. § 78c(a)(10); but that definition, as are all the definitions in § 78c(a), is preceded by the phrase "unless the context otherwise requires;" the definition of "security" in the 1933 Act is prefaced by the same phrase, 15 U.S.C. § 77b(1). Although the transaction involved in *Frederiksen* appeared to be within the letter of the 1934 Act it was not—given the commercial as opposed to investment character—within the spirit, nor within the intention of its makers. *Id.* at 1150. Indeed, as the *Frederiksen* court noted, the "literal application" argument was specifically rejected by the Court in *Forman, supra*, 421 U.S. at 848, 95 S.Ct. at 2058, in the following terms:

> We reject at the outset any suggestion that the present transaction evidenced by the sale of shares called 'stock,' must be considered a security transaction simply because the statutory definition of a security includes the words 'any ... stock.' Rather we adhere to the basic principal that has guided all of the Court's decisions in this area:
>
> > '[I]n searching for the meaning and scope of the word "security" in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality.' *Tcherepnin v. Knight*, 389 U.S. 332, 336 [88 S.Ct. 548, 553, 19 L.Ed.2d 564] (1967).

As in *Frederiksen*, the "economic reality" of this transaction was that Muller intended to manage and operate the business and had no intention to rely on the present and future efforts of SCM to produce profits. Thus, the securities law claim fails for the reason that the contemplated transaction did not involve an investment of money in a common enterprise from which the profits were expected "to come solely from the efforts of others." *Int'l Brhd. of Teamsters v. Daniel*, 439 U.S. 551, 558 & n.11, 99 S.Ct. 790, 815, 58 L.Ed.2d 808 (1979), *quoting*

*Forman, supra*, 421 U.S. at 851–522, 95 S.Ct. at 2060; *SEC v. W. J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946); *Williamson v. Tucker*, 632 F.2d 579, 592–601 (5th Cir. 1980); *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027 (2d Cir. 1974); *Barsy v. Verin*, 508 F.Supp. 952 (N.D.Ill.1981); *Wieboldt v. Metz*, 355 F.Supp. 255 (S.D.N.Y.1973).

Further, the claimed frauds of overstated assets and inflated income were not made with the scienter required to be established under the federal securities laws or under the common law. As set forth above, these were projections made in good faith. The profit projection proved to be more or less accurate although SCM management believed otherwise at one time. Although the assets described to Muller in the spring of 1976 may have been overstated by a million dollars, there is no evidence that such overstatement was made with a fraudulent intent or even recklessly. *See Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976); *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 165 (2d Cir. 1980); *Samuels v. Eleanora Baheer, B.V.*, 500 F.Supp. 1357, 1361–62 (S.D.N.Y.1980).

Of course, it has been found as fact above that SCM had determined not to complete the transaction after Egli's analysis at the end of 1976. There was no statement to that effect, and SCM sought to imply that it still intended to go forward with the transaction. There was, however, no misrepresentation to that effect. At worst there was a failure to disclose the fact of a decision to "kill the deal." Were the federal securities laws applicable, this omission would require further analysis. In the last analysis there was no purchase and sale of a security, and despite the dutiful citation of *Omega Executive Services, Inc. v. Grant*, [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,848 at 95,445 (S.D.N.Y.1979) by Reprosystem, the securities laws are thus inapplicable.

### The Contract Claim

These conclusions simply return the court to where the parties have been throughout

the litigation, the determination of New York law with respect to the rights and liabilities of parties seeking to contract.[8] Several principles of law relevant to the determination of whether a contract existed are urged by the parties as "ancient," "cardinal" and "controlling." As is often the case, initial guidance is derived from Judge Weinfeld:

> The day is long past when a red ribbon and seal is required upon documents which contain the terms of the parties' agreements in order to validate such agreements.

*Royal Indemnity Co. v. Westinghouse Elec. Corp.*, 385 F.Supp. 520, 522 (S.D.N.Y.1974). Indeed, it is well established that where parties reach an agreement they are bound by it, whatever its form and however it is manifested. *See e. g., Kleinschmidt Div. of SCM Corp. v. Futuronics Corp.*, 41 N.Y.2d 972, 395 N.Y.S.2d 151, 363 N.E.2d 701 (1977); *Sanders v. Pottlitzer Bros. Fruit Co.*, 144 N.Y. 209, 39 N.E. 75 (1894).

■ What is looked to in determining whether an agreement has been reached is not the parties' after-the-fact professed subjective intent, but their objective intent as manifested by their expressed words and deeds at the time. *Brown Bros. Electrical Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 393 N.Y.S.2d 350, 352, 361 N.E.2d 999, 1001 (1977). If the parties' expressions and conduct would lead a reasonable man to determine that they intended to reach a binding agreement, their agreement will be enforced. *Phillip v. Gallant*, 62 N.Y. 256, 263 (1875). In determining whether the parties entered into a contractual agreement and what were its terms,

> disproportionate emphasis is not to be put on any single act, phrase, or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objec-

tives they were striving to attain [citations omitted].

*Brown Bros., supra*, 393 N.Y.S.2d at 352.

■ Moreover, while there is no enforceable agreement if the parties have not agreed on the essential terms, *Interocean Shipping Co. v. Nat'l Shipping & Trading Co.*, 462 F.2d 673, 676 (2d Cir. 1972); *ABC Trading Co. v. Westinghouse Elec. Supply Co.*, 382 F.Supp. 600 (E.D.N.Y.1974), in New York and across the country a binding contract can be formed despite "material open issues." *See e. g.*, N.Y.U.C.C. ("UCC") 2–204, (McKinney 1964). As the New York Court of Appeals held in *Kleinschmidt, supra* :

> Under the Uniform Commercial Code [2–204(3)], if the parties have intended to contract, and if an appropriate remedy may be fashioned, a contract for sale does not fail for indefiniteness if terms, even important terms, are left open .... It is no longer true that dispute over material terms inevitably prevents formation of a binding contract. What is true ... is that when a dispute over material terms manifests a lack of intention to contract, no contract results.

> · · · · ·

> Thus, when there is basic agreement, however manifested and whether or not the precise moment of agreement may be determined, failure to articulate that agreement in the precise language of a lawyer, with every difficulty and contingency considered and resolved, will not prevent formation of a contract ....

395 N.Y.S.2d at 152, 363 N.E.2d at 702. If the parties fail to work every aspect of the agreement out, such terms can be resolved by the court. *See e. g. United States v. Bedford Associates*, 657 F.2d 1300 at 1310, 1311 (2d Cir. 1981); *V'Soske v. Barwick*, 404 F.2d 495 (2d Cir. 1968); *American Cyanamid Co. v. Elizabeth Arden Sales Corp.*, 331 F.Supp. 597 (S.D.N.Y.1971). Even failure

---

**8.** The parties have relied on New York law in support of their respective positions on the contract issue, assuming accurately that it would govern in this action where Muller and SCM are New York residents, virtually all of the negotiations and contract drafting took place here, and the various contract drafts all specify that New York law should govern disputes arising thereunder.

to agree expressly on the payment terms does not alone prevent an enforceable agreement. *Rose v. Spa Realty Associates,* 42 N.Y.2d 336, 397 N.Y.S.2d 922, 366 N.E.2d 1279 (1977).

It is recognized that if the parties intend not to be bound until they have executed a formal document embodying their agreement, they will not be bound until then. *Int'l Telemeter Corp. v. Teleprompter Corp.,* 592 F.2d 49, 56, and 57–58 (Friendly, J. concurring); *V'Soske, supra,* at 499; *Chromalloy American Corp. v. Universal Housing Systems of America, Inc.,* 495 F.Supp. 544, 550 (S.D.N.Y.1980); *Scheck v. Francis,* 26 N.Y.2d 466, 311 N.Y.S.2d 841, 260 N.E.2d 493 (1970); UCC 2–305(4); Restatement (Second) of Contracts § 32, comment c (Tent. Drafts 1–7, 1973); 1 Williston on Contracts § 28 at 66–67 (3d ed. 1957). On the other hand the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their less formal agreement from taking effect prior to that event. *Teleprompter, supra; V'Soske, supra; Banking & Trading Corp. v. Floete,* 257 F.2d 765, 769 (2d Cir. 1958); *see also Sommer v. Hilton Hotels Corp.,* 376 F.Supp. 297 (S.D.N.Y. 1974); *Tymon v. Linoki,* 16 N.Y.2d 293, 266 N.Y.S.2d 357 (1965); *APS Food Systems, Inc. v. Ward Foods, Inc.,* 70 A.D.2d 483, 421 N.Y.S.2d 223 (1st Dep't 1979); *S. J. Groves & Sons Co. v. L. M. Pike & Son, Inc.,* 41 A.D.2d 584, 340 N.Y.S.2d 230 (4th Dept. 1973); *Zirman v. Beck,* 34 Misc.2d 597, 225 N.Y.S.2d 330 (Sup.Ct.Bronx.Co.1962); *Karson v. Arnow,* 32 Misc.2d 499, 224 N.Y.S.2d 891 (Sup.Ct.N.Y.Co.1962). As put succinctly by Professor Corbin:

> The parties have power to contract as they please. They can bind themselves orally or by informal letters or telegrams if they like. On the other hand, they can maintain complete immunity from all obligation, even though they have expressed agreement orally or informally upon every detail of a complex transaction. The matter is merely one of expressed intention. If their expressions convince the court ·that they intended to be bound without a formal document, their con-

tract is consummated, and the expected formal document will be nothing more than a memorial of that contract. [footnote omitted].

1 A. Corbin Contracts, § 30 at 98–99 (2d ed. 1963).

Again, these rules are but aspects of a broader governing principle which looks to reality and substance in a transaction, not form. As noted in *V'Soske, supra,* 404 F.2d at 499:

> Contract law has progressed and evolved sounder principles since the days of ritualistic and formalistic sealed instrument requirements. Thus, these rules, placing the emphasis on intention rather than form, are sensible and reasonable.

This objective theory of contracts was stated by Judge Learned Hand in *Hotchkiss v. National Bank of New York,* 200 F. 287, 293 (S.D.N.Y.1911), *aff'd,* 201 F. 664 (2d Cir. 1912), *aff'd,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913), as follows:

> A contract has, strictly speaking, nothing to do with personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort.

*See Brown Bros., supra,* 393 N.Y.S.2d at 351–52, 361 N.E.2d at 1000–02.

In a series of decisions which I find controlling here, our circuit has applied this objective theory of contracts to various transactions, some involving the transfer of substantial business entities, and found a contract to exist from an oral or informal agreement.

In *American Cyanamid Co. v. Elizabeth Arden, supra,* it was held that in a letter agreement for the purchase of a "far flung business" from a large and sophisticated

corporation for about $35,000,000, it was not fatal to fail to include representations and warranties, to leave to further negotiations questions relating to an escrow fund for the purchase price, to fail to establish accounting principles to verify the net worth, and to omit the closing date. Similarly, an oral contract with Joseph E. Seagram & Sons, Inc. to provide the plaintiff with an opportunity to purchase a wholesale liquor distributorship of an approximate value and profit potential within a reasonable time has been upheld as sufficiently definite to be enforceable. *Lee v. Joseph E. Seagram & Sons, Inc.*, 413 F.Supp. 693 (S.D.N.Y. 1976), *aff'd*, 552 F.2d 447 (2d Cir. 1977).

In *V'Soske, supra*, an informal exchange of "correspondence" resulted in an enforceable contract for the purchase of a business for approximately $1.7 million, even though the parties contemplated the subsequent execution of a formal written agreement. In *Teleprompter, supra*, International Telemeter and Teleprompter had engaged in a sequence of negotiations over the terms of an agreement settling complex patent litigation. A series of drafts of the settlement agreement was exchanged, and the parties orally agreed on the terms of the settlement. However, prior to delivery of the signed settlement documents, new management at Teleprompter refused to proceed with the settlement agreement. The Second Circuit upheld the District Court's finding under New York law that since the parties had reached a final agreement and had manifested objective indications of their intent to be bound, the settlement agreement would be enforced. In *Viacom Int'l, Inc. v. Tandem Productions, Inc.*, 526 F.2d 593, 595–96 (2d Cir. 1975), an oral agreement governing distribution and syndication rights for the television program "All In The Family" was held to be binding. *Accord, Ellis Canning Co. v. Bernstein*, 348 F.Supp. 1212 (D.Colo.1972); *Itek Corp. v. Chicago Aerial Industries, Inc.*, 248 A.2d 625 (Sup.Ct.Del.1968).

■ Thus, the objective manifestations of SCM and the plaintiffs must be weighed by the court and the line drawn between the competing principles set forth above. The weighing has been done, and it has been determined as a matter of fact that eventually both parties intended to be bound by the Final Drafts. Taking into account the totality of the parties' objective manifestations of intent as the transaction progressed and the circumstances surrounding the negotiations, I reject SCM's contention that a final signing would be required to constitute a binding agreement. In the circumstances at bar, SCM's—indeed, both parties'—contemplation of subsequent formal signed agreements did not overcome the objective facts which established an agreement. Implicit here, as well, is my conclusion that none of the contract terms which remained open after consensus was reached on the Agreement in Principle and then on the Final Drafts were such, taken separately or together, as to prevent the agreements from taking effect. The indefiniteness of the purchase price was insignificant in light of the formula provided by the parties for the court, if necessary, to give content to that term. *United States v. Bedford Associates, supra*, 657 F.2d at 1310. Additionally, the alleged need for SCM Board approval of any final agreements, *e. g. Ashton v. Chrysler Corp.*, 261 F.Supp. 1009, 1013 (E.D.N.Y.1965); *Weisner v. 791 Park Avenue Corp.*, 6 N.Y.2d 426, 434, 190 N.Y.S.2d 70, 75–76, 160 N.E.2d 720, 724 (1959), is without significance here, given the language of the Final Drafts and the involvement of the Board in the agreements already reached.

■ Nor is the existence of the agreement defeated by the requirements of the statute of frauds. Indeed, SCM does not seriously dispute the point.[9] It is well-es-

---

**9.** The arguably relevant statute of frauds provisions are the following, which provide, in full or in pertinent part:

N.Y.G.O.L. § 5–701 (McKinney, Supp.1980):

(a) Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his

tablished under New York law that the memorandum required by the statute of frauds need not be incorporated in a single document, but may be derived from several documents which relate to each other, only one of which need be prepared by the defendant. *Weitnauer Trading Company Ltd. v. Annis*, 516 F.2d ·878, 880 (2d Cir. 1975); *Great Destinations, Inc. v. Transportes Aereas Portuguese S.A.R.L.*, 460 F.Supp. 1160 (S.D.N.Y.1978); *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 110 N.E.2d 551 (1953); *APS Food Systems, supra*, 421 N.Y. S.2d at 225. The court in the *Crabtree* case thus recognized that the law "permit[s] the signed and unsigned writings to be read together, provided that they clearly refer to the same subject matter or transaction." 305 N.Y. at 55, 110 N.E.2d 551.

The statute of frauds requirements have been satisfied by the Final Drafts and the acts of SCM as found above, including the December 17, 1976 telexes to the general managers of the copier subsidiaries, the December 16, 1976 letter signed by Frank De-Maio to Mita Holland B.V., the testimony concerning the meetings of December 15 and 16 and the documents prepared on or about December 31, 1976 by Herbert Egli, referring to. "the deal."

 However, although under these principles a contract has been established,

the matter does not end there. Even having established an enforceable agreement a plaintiff cannot be allowed to recover for an alleged breach of contract unless he can establish by a preponderance of the evidence that the defendant would have received "substantially what he bargained for." 6 Williston, *supra*, § 884 at 402. *See United States v. Penn Foundry & Mfg. Co.*, 337 U.S. 198, 69 S.Ct. 1009, 93 L.Ed. 1308 (1949); *United States Overseas Airlines, Inc. v. Compania Aerea Viajes Expresos de Venezuela, S.A.*, 246 F.2d 951, 952 (2d Cir. 1957); *Hodes v. Hoffman Int'l Corp.*, 280 F.Supp. 252, 258–59 (S.D.N.Y.1968). Here, under both common law and the UCC, the spurned buyer's right of action for anticipatory breach depends on his shouldering the burden of demonstrating his readiness, willingness and ability to tender performance when due. *See Scholle v. Cuban-Venezuelan Oil Voting Trust*, 285 F.2d 318 (2d Cir. 1960); *Decor by Nikkei Int'l, Inc. v. Federal Republic of Nigeria*, 497 F.Supp. 893, 907–908 (S.D.N.Y.1980), *aff'd*, 647 F.2d 300 (2d Cir. 1981); *UFITEC, S.A. v. Trade Bank & Trust Co.*, 21 A.D.2d 187, 249 N.Y.S.2d 557 (1st Dep't 1964), *aff'd*, 16 N.Y.2d 698, 261 N.Y.S.2d 893 (1965).

 The aggrieved plaintiff does not, in order to satisfy his burden, have to actually tender a performance which has been rendered futile by defendant's repudi-

lawful agent, if such agreement, promise or undertaking:
(1) By its terms is not to be performed within one year from the making thereof . . . .
N.Y.U.C.C. § 1–206 (McKinney 1964):
(1) Except in the cases described in subsection (2) of this section a contract for the sale of personal property is not enforceable by way of action or defense beyond five thousand dollars in amount or value of remedy unless there is some writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by his authorized agent.
(2) Subsection (1) of this section does not apply to contracts for the sale of goods (Section 2–201) nor of securities (Section 8–319) nor to security agreements (Section 9–302).
N.Y.U.C.C. § 2–201 (McKinney 1964):
(1) Except as otherwise provided in this section a contract for the sale of goods for the

price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.
N.Y.U.C.C. § 8–319 (McKinney 1964):
A contract for the sale of securities is not enforceable by way of action or defense unless
(a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price. . . .

ation, *Scholle, supra; Allbrand Discount Liquors, Inc. v. Times Square Stores Corp.*, 60 A.D.2d 568, 399 N.Y.S.2d 700 (2d Dep't 1977); *UFITEC, supra,* 249 N.Y.S.2d at 560. Further, plaintiff's burden upon anticipatory repudiation by defendant could be satisfied by a showing that defendant, by his actions, rendered performance by plaintiff impossible. *Amies v. Wesnofske,* 255 N.Y. 156, 162–63, 174 N.E. 436 (1931). However, this record fails to establish that sort of impossibility. Here, I have found as a matter of fact that, quite apart from any wrongs committed by SCM, Muller has failed to demonstrate by a preponderance of the evidence that he possessed the ability to come up with the cash at closing. This failure bars enforcement of the otherwise enforceable agreement.

### The Duty to Perform in Good Faith

On the facts as I have found them, I conclude not only that SCM breached the agreements reached at the end of 1976, but that it specifically breached its duty of good faith negotiation and performance required by those agreements. A fundamental obligation to deal in good faith, found in established case law, required SCM to act otherwise than to single-mindedly bail out of what it came to see as a bad deal.

*Itek Corp. v. Chicago Aerial Industries, Inc., supra,* presented a similar situation. In that case, Itek, a prospective purchaser of the assets of Chicago Aerial Industries, Inc. ("CAI"), sued for breach of a contract to sell those assets. The parties had arrived at an agreement on the price, which was subject to several conditions including "that formal documents be prepared to the satisfaction of the parties," and they had also signed a "Letter of Intent." Nevertheless, CAI received a better offer from another purchaser, terminated discussions with Itek

and sold the assets to the higher bidder. The court held that there was evidence which would support the conclusion that at the time of the Letter of Intent, Itek and CAI intended to be bound to the agreement for the sale of assets, and further that the parties' "Letter of Intent," which set forth the basic terms of their transactions, "obligated each side to attempt in good faith to reach final and formal agreement." 248 A.2d at 625.

While the letter of intent involved in *Itek* contained an explicit requirement that the parties shall "make every reasonable effort" to close the deal formally, *see also Arnold Palmer Golf Co. v. Fuqua Industries, Inc.,* 541 F.2d 584 (6th Cir. 1976); *Thompson v. Liquichimica of America, Inc.,* 481 F.Supp. 361 (S.D.N.Y.1979) and 481 F.Supp. 365 (S.D.N.Y.1979); *American Broadcasting Companies, Inc. v. Wolf,* 52 N.Y.2d 394, 438 N.Y.S.2d 482 (1981), the *Itek* reasoning has been applied in similar commercial settings where the good-faith duty has been enunciated. Thus, in *Pepsico, Inc. v. W. R. Grace & Co.,* 307 F.Supp. 713 (S.D.N.Y.1969), where the parties had issued a joint press release announcing their "agreement in principle" to sell a controlling interest in a subsidiary of Grace, the court noted Pepsico's argument, based on *Itek,* that the agreement in principle carried with it an obligation to negotiate the terms of a definitive agreement in good faith, and responded as follows:

Assuming that there was a binding agreement on May 8th [the date the agreement in principle was announced], we would agree that an obligation to negotiate in good faith was implied....

*Id.* at 720. *See also American Cyanamid, supra,* 331 F.Supp. at 606; Knapp, Enforcing the Contract to Bargain, 44 N.Y.U.L. Rev. 673, 716–23 (1969).[10]

---

10. Professor Knapp who in his article advocates the enforcement of a preliminary agreement in such a context specifically as a contract to bargain, offers the following expression of the character of manifestation of intention which would serve to create such a contract:

The essential question is whether the parties have expressed both satisfaction with and

commitment to the essential terms of the proposed transaction, to the extent that each would reasonably regard the other as unjustified in withdrawing for any reason other than a failure—after negotiation in good faith—to arrive at a complete and final agreement (footnote omitted).

Indeed, under New York law, every contract carries with it an implied obligation of good faith. *Lowell v. Twin Disc, Inc.*, 527 F.2d 767, 770–71 (2d Cir. 1975); *Niagara Mohawk Power Corp. v. Graver Tank & Mfg. Co.*, 470 F.Supp. 1308, 1316 (N.D.N.Y.1979); *Joseph E. Seagram & Sons, Inc., supra*, 413 F.Supp. at 698; *Sommer v. Hilton Hotels Corp., supra*, at 301–02; *Matter of DeLaurentiis*, 9 N.Y.2d 503, 215 N.Y.S.2d 60, 63–64, 174 N.E.2d 736, 738–739 (1961); *Baker v. Chock Full O'Nuts Corp.*, 30 A.D.2d 329, 292 N.Y.S.2d 58 (1st Dep't 1968). This obligation has statutory force as well. The policy behind the Uniform Commercial Code is to "give effect to the agreement which has been made . . . conditioned by the requirement of good faith action which is made an inherent part of all contracts within this Act." UCC § 2–305, Official Comment 6 (McKinney 1964). In addition, the Code in § 1–203 specifically provides that "[e]very contract or duty within this Act imposes an obligation of good faith in its performance or enforcement."

Thus, while a party to any negotiations for the purchase and sale of property is not automatically obligated to carry the negotiations through to closing, *see Brause v. Goldman*, 10 A.D.2d 328, 199 N.Y.S.2d 606, 611 (1st Dep't 1960), *aff'd*, 9 N.Y.2d 620, 210 N.Y.S.2d 225, 172 N.E.2d 78 (1961), consistent with principles of New York law dating back to *Wood v. Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917), SCM was obligated to act fairly under the Agreement in Principle and the Final Drafts to negotiate in good faith to finalize matters and then presumably, to accomplish the end transaction.

*The Damages*

Although I have concluded that Muller is not entitled to recover his full expectation damages however those might be measured, *compare Lee v. Joseph E. Seagram & Sons, Inc., supra*, 413 F.Supp. at 705–07; *Pennsylvania Co. v. Wilmington Trust Co.*, 39 Del.Ch. 453, 166 A.2d 726 (Ch.Ct.1960), *aff'd*, 40 Del.Ch. 140, 172 A.2d 63 (Sup.Ct.1961); *Gold Seal Prods., Inc. v. R.K.O. Radio Pictures, Inc.*, 134 Cal.App.2d 843, 286 P.2d 954 (Dist.Ct.App.1955), SCM's breach of the agreement reached and the concomitant breach of its good faith obligation entitle Muller to relief.

As the determination of liability on these facts is not simple, neither is the assignment of a proper remedy. The court has not been presented with nor has it discovered a similar case involving on the one hand the bad faith repudiation of a preliminary agreement for the sale of a business, and on the other hand the failure of proof by the would-be purchaser of his own ability to perform when such was to come due. A recovery allowed under these circumstances may be viewed as the appropriate compensation for the defendant's breach of its duty to deal in good faith, *see American Broadcasting Companies, Inc. v. Wolf, supra*, 438 N.Y.S.2d at 485, 487–88; *Knapp, supra*, at 723–26, or, more traditionally, as the appropriate measure of damages, all things considered, for SCM's repudiation of the agreement reached by the parties. *Cf. Fair Sky, Inc. v. Int'l Cable Ride Corp.*, 23 A.D.2d 633, 257 N.Y.S.2d 351, 353 (1st Dep't 1965).

The most logical and readily available measure of damages under these circumstances is the profit earned by SCM in the period before the anticipated closing during which, according to the agreement, the copier subsidiaries were being run in the normal course of business on Muller's account. This fund, generated before to the anticipated closing date, was accruing to Muller above and beyond the value of the assets of the subsidiaries that he was to receive in

---

44 N.Y.U.L.R. at 720. After some analysis, he suggests additionally:

[A] contract to bargain is likely to be enforced only where there has been either a unilateral withdrawal from negotiations or at least an insistence on terms so clearly unreasonable that they could not have been advanced with any expectation of acceptance, coupled with some demonstrable advantage to be gained by defendant in avoiding the contemplated transaction.

*Id.* at 723. *See also* Dugdale and Lowe, Contracts to Contract and Contracts to Negotiate, [1976] J.Bus.Law 28.

exchange for the price that was finally to be agreed on. Given his failure to establish his own ability to perform, Muller certainly may not recover the bargained-for properties, the profit realized thereon after the would-be closing date or even the profit accruing to SCM from the sale of the properties to others. However, it would be inequitable in view of SCM's bad faith conduct from which it was able to profit so handsomely, to allow it to retain that amount which, in exchange for Muller's commitment to the deal, was to be accruing to his account even before his ability to perform was to be tested at closing.

This conclusion seems appropriate in the light of the doctrine of restitution or unjust enrichment. The remedy of restitution to prevent unjust enrichment is commonly applied both in the realm of quasi-contract and as an alternative basis for recovery upon breach of contract. See Restatement, *supra*, Topic 4-Restitution §§ 384, 391, and Introductory Note thereto (Tent. Draft No. 14, 1979); 5 Corbin, *supra*, §§ 1106–07. This doctrine rests, generally, upon the equitable principle that a person shall not be allowed to enrich himself at the expense of another. *Miller v. Schloss*, 218 N.Y. 400, 407, 113 N.E. 337 (1916). It is not necessarily grounded on contract or on promise but on an obligation created by law,

> when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it, and which *ex aequo et bono* belongs to another.

*Id.; see Paramount Film Distributing Corp. v. State*, 30 N.Y.2d 415, 334 N.Y.S.2d 388, 393, 285 N.E.2d 695, 698 (1972); *Friar v. Vanguard Holding Corp.*, 78 A.D.2d 83, 434 N.Y.S.2d 698, 701–02 (2d Dep't 1980); *Eightway Corp. v. Dime Savings Bank*, 94 Misc.2d 274, 404 N.Y.S.2d 302 (Civ.Ct. Queens Co. 1978), *aff'd*, 99 Misc.2d 989, 420 N.Y.S.2d 837 (Sup.Ct. Queens Co. 1979). An element in the equation is that the unjust enrichment of the defendant be at the expense of the claimant, and this usually necessitates a finding that a benefit was conferred by the claimant, or in other words that a benefit corresponds to a loss to the claimant. *See Nacional Financiera, S.A. v. Banco De Ponce*, 120 N.Y.S.2d 373, 415–17 (Sup.Ct. N.Y.Co. 1953); *aff'd*, 283 A.D. 939, 131 N.Y.S.2d 303 (1st Dep't 1954); 50 N.Y. Jur. Restitution § 6 (1966). However, there is case support for a finding of unjust enrichment without such a readily identifiable correspondence. *Saunders v. Kline*, 55 A.D.2d 887, 391 N.Y.S.2d 1, 2 (1st Dep't 1977); 50 N.Y.Jur., *supra*, at 162; *see also Brooks v. Peoples' Bank*, 233 N.Y. 87, 134 N.E. 846 (1921); *Roberts v. Ely*, 113 N.Y. 128, 20 N.E. 606 (1889); *Robert Reis & Co. v. Volck*, 151 A.D. 613, 136 N.Y.S. 367 (1st Dep't 1912); Knapp, *supra*, at 724–25 n.174; *see generally* 4 Corbin, *supra*, § 979 and 5 Corbin, *supra*, § 1107.

Under the circumstances presented here where SCM had obligated itself as part of the agreements reached to run the copier subsidiaries for Muller's account from August 31, 1976 to the anticipated closing date, I conclude that to allow SCM to retain the profit earned during all of that period would be to condone unjust enrichment.[11]

---

11. The plaintiff has failed to establish the basis for promissory estoppel urged as an alternative ground for recovery.

Based on the reliance principle, the doctrine is set forth in § 90(1) of the Restatement, *supra*, (Tent.Drafts Nos. 1–7, 1973) as follows:

> A promise which the promisor should reasonably expect to induce action or forebearance on the part of the promisee or a third person and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise. The

remedy granted for breach may be limited as justice requires.

*See Schmidt v. McKay*, 555 F.2d 30, 36 (2d Cir. 1977); *James King & Son, Inc. v. DeSantis Constr. No. 2 Corp.*, 97 Misc.2d 1063, 413 N.Y. S.2d 78, 81 (Sup.Ct. N.Y.Co. 1977). *But see Swerdloff v. Mobil Oil Corp.*, 74 A.D.2d 258, 427 N.Y.S.2d 266, 268 (2d Dep't), *appeal denied*, 50 N.Y.2d 913, 431 N.Y.S.2d 523 (1980). The measure of damages under this theory would be the value of the claimant's action or forebearance in reliance, to its detriment. Such detriment may be found in forebearance

Whatever the theory, there would be a certain logic to fashioning a recovery to encompass out-of-pocket legal and other expenditures in preparation for performance, or even the cost of forebearance (presumably the value of opportunities foregone). However, bearing in mind the flexibility of available contract remedies, see 5 Corbin, *supra*, § 996, since Muller is in a sense gaining the benefit of his bargain—or, at least, as much of it as he is entitled to under the circumstances—he will not at the same time recover his legal fees incurred to produce this benefit, apparently the only significant out-of-pocket expense, or any other reliance-type damages. *See* Corbin, *supra*, §§ 1034, 1036. *Cf. Gruen Industries, Inc. v. Biller*, 608 F.2d 274, 280–82 (7th Cir. 1979). I have concluded the proper remedy is the award to Muller of the profit earned by the copier subsidiaries from August 31, 1976 to February 2, 1977, the date of the repudiation.

On the basis of this opinion, a conference will be held on July 9, 1981 at 5:00 p. m. to determine whether any further hearing is required in order to enter judgment in accordance with this opinion.

IT IS SO ORDERED.

## APPENDIX

The August memorandum reads as follows:

1. SCM to sell the stock of the German, French, Belgium and Swiss subsidiaries and the copier assets of the Chur and U.K. subsidiaries.

2. SCM shall have the right to allocate the total proceeds, assigning values to each of the four stock sales and two asset sales.

3. In no case will cash and securities be included nor will assets related to the typewriter distribution business (which is currently being separated out) be included.

4. The names of the purchased subsidiaries will be changed and the use of the SCM name and logo will be discontinued within an agreed upon time limit.

5. SCM will retain or discharge all balance sheet liabilities except those that relate to compensation and employee benefits, which will be assumed by the purchaser.

6. In the U.K., liability for employees and leases relating to the copier business will be assumed by the purchaser.

7. Goods in transit from suppliers (purchased under contract commitments and prepaid) will be reimbursed by purchaser at delivered cost rather than being included in the inventory account.

8. Purchaser will assume responsibility for performance under purchase agreements entered into by SCM for equipment and supplies for the operations to be sold.

9. New York personnel directly related to International Copier operations will be employed by purchaser.

The September memorandum reads as follows:

1. We will license use of name for three years with appropriate safeguards on its use.

2. We will warrant against undisclosed liabilities to the extent that they exceed a pool of $150,000, the purpose of which is to absorb claims not in excess of $10,000 per claim. We will have the right to dispose of claims as we see fit.

3. We will only be responsible for shortages of inventory count and then to

from action which amounts to a change in position, in reliance on the words or deeds of the defendant. *Cf. Warren v. Hudson Pulp & Paper Corp.*, 477 F.2d 229 (2d Cir. 1973). In the commercial setting of this case, the extent of Muller's detrimental reliance might be the value of other business opportunities foregone

in anticipation of the closing of this deal pursuant to the agreements already reached. *See Swerdloff, supra*, 427 N.Y.S.2d at 268–270; Goetz and Scott, Enforcing Promises: An Examination of the Basis of Contract, 89 Yale L.J. 1261, 1267–70, 1287–88 (1980). However, no such evidence has been adduced.

the extent that such shortages exceed a pool equal to the inventory reserve. (time limitation)

4. We will be responsible for uncollectable receivables in excess of a pool which is to be equal to the receivable reserve plus $200,000, but not less than $500,000. We will reimburse purchaser at the rate of 53c/$ (?) for losses in excess of the pool. (time limitation)